## McCoy *v.* C., I., ST. L. & C. R. Co. and another.[*]

*(Circuit Court, S. D. Ohio, W. D. July 31, 1882.)*

1. **ACTIONS AGAINST FOREIGN CORPORATIONS IN UNITED STATES COURTS—SERVICE OF PROCESS UPON AGENTS.**

   Where foreign corporations engage in business in a state whose laws provide that they may be summoned by process served upon an agent in charge thereof, they are " found " in the district in which such agent is doing business, within the meaning of the act of congress of March 3, 1875, (18 St. at Large, 470,) and may be served in that manner in suits brought in the United States courts.

   *Mohr & Mohr Distilling Co.* v. *Ins. Cos.* 12 FED. REP. 474, followed.

2. **PUBLIC NATURE AND DUTIES OF RAILROADS.**

   Railroad corporations are *quasi* public corporations, dedicated to the public use. In accepting their charters they necessarily accept them with all the duties and liabilities imposed upon them by law. Thus a *quasi* public trust is created which clothes the public with an interest in the use of railroads, which can be controlled by the public to the extent of the interest conferred therein.

3. **JURISDICTION OF EQUITY—RAILROADS—INJUNCTION.**

   In the absence of some statute providing another and different remedy, courts of equity have jurisdiction to enforce this *quasi* public trust, and compel railroad corporations to discharge the duties imposed upon them by law; and persons injured by the wrongful action or non-action of such corporations may seek redress by injunction, and are not bound to resort to proceedings in *mandamus* or to an action at law for damages.

4. **RAILROADS—DISCRIMINATION IN DELIVERING LIVE-STOCK TO STOCK-YARDS—REMEDY.**

   A railroad company cannot bind itself to deliver to a particular stock-yard all live-stock coming over its line to a certain point, but it is bound to trans-

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

port over its road and deliver to all stock-yards at such point, reached by its tracks or connections, all live-stock consigned, or which the shippers desire to consign, to them, upon the same terms and in the same manner as under like conditions it transports and delivers to their competitors; and the performance of this duty may be compelled by injunction at the suit of the proprietor of the stock-yards discriminated against.

In Equity. Motion for preliminary injunction.

*Ramsey & Matthews,* for complainant.

*Hoadly, Johnson & Colston,* for defendant Cincinnati, Indianapolis, St. Louis & Chicago Railroad Company.

*Paxton & Warrington* and *Stallo, Kittredge & Shoemaker,* for defendant United Railroads Stock-Yards Company.

BAXTER, C. J. The facts in this case are few and simple. After averring that he is a citizen of Kentucky, and that the United Railroads Stock-Yards Company is an Ohio corporation, and that the defendant the Cincinnati, Indianapolis, St. Louis & Chicago Railroad Company is a corporation organized under the laws of Ohio, Indiana, and Illinois, the complainant charges that he is lessee of certain stock-yards, referred to in his bill, situated on the line of the Cincinnati & Baltimore Railroad Company's road, in Hamilton county, Ohio; that his yards are connected with said railroad by a suitable switch; that he is there engaged in the business of receiving, feeding, housing, and shipping live-stock; that the Cincinnati, Indianapolis, St. Louis & Chicago Railroad Company's road connects with the Cincinnati & Baltimore Company's road two miles south of complainant's yards; and that the said defendant is, by contract, in the use of that portion of said Cincinnati & Baltimore Railroad Company's road lying between said point of junction and complainant's yards, over which it is carrying on the business of a common carrier of live-stock, making regular deliveries to, and receiving stock from, its co-defendant, loaded in cars standing on the track. He furthermore alleges such receipt and delivery of stock in cars on the track is necessary to the successful prosecution of his business, but that, in disregard of the obligations imposed on it by law, said defendant has entered into a contract with the United Railroads Stock-Yards Company, its co-defendant, whereby it has covenanted to make said United Railroads Stock-Yards Company's yards its depot for the receipt and delivery of all live-stock carried by it to and from Cincinnati, and obliged itself, in so far as it could lawfully do so, to deliver all live-stock carried by it to, or received for shipment from, Cincinnati to and from its co-defendant, and that, relying on said contract as a valid obligation and a sufficient justification of its action

in the premises, said defendant unlawfully and wrongfully refuses to receive stock from, or deliver stock to, complainant, except through the United Railroads Stock-Yards Company's yard, whose yards, it appears, adjoin the complainant's yards.

Complainant thereupon prays for an injunction to restrain said defendant from so discriminating against it, and to compel it to receive and make deliveries of stock to him in the same manner and on as favorable terms as it receives from and delivers to complainant's said competitor.

The application for a preliminary injunction came on for argument before me at Knoxville on the twelfth of July, 1882, when the Cincinnati, Indianapolis, St. Louis & Chicago Railroad Company filed its plea denying the jurisdiction of this court, because, as the plea avers, it is not a corporation of Ohio, as it alleged, but that it is a corporation under and in virtue of the laws of the state of Indiana alone. It does not, by its plea, deny service of process or raise any question in regard to its regularity or legal sufficiency. But the counsel insisted in argument that as defendant was an Indiana corporation, and a citizen of that state, it could not be lawfully served with process in this jurisdiction, and that it was, therefore, not legitimately before the court.

We need not stop to demonstrate that the question argued by counsel is broader than the plea, inasmuch as if such question was raised by the plea I would not hesitate to overrule it.

We concede that corporations—mere legal entities—can only legally exist within the territorial limits of the sovereignty creating them; that they must dwell in the places of their creation, and can not migrate to other sovereignties. But it is as equally well settled that they can do business, if not inhibited by law from so doing, in foreign states and countries, and that they may be there sued in relation to the same. 1 Redfield, Railw. p. 63, § 4.

Hence, if it were conceded that the defendant is an Indiana corporation, as alleged in its plea, it appears that it owns and operates a railroad in Ohio, where its president resides and its principal office is located, and that it is there, by legislative permission, engaged in the business of a railroad carrier. If so, it is liable to be served with process in this jurisdiction. "This court," says Judge Force, of the superior court of Cincinnati, in a case recently decided by him, "has, by statute, jurisdiction of an action against a foreign corporation when such corporation can be found within the city. A corporation can be found where it can be served with a process according to

law. A foreign corporation can be served with a summons according to law (in Ohio) by service upon a managing agent." And about the same time Mr. Justice Matthews said, in a similar case, pending in this court, that "where foreign corporations establish an agency in a state whose laws provide (as in this) that they may be summoned by process served upon an agent, they are 'found' within the district in which such agent is doing business, within the meaning of the act of congress of March 3, 1875, and may be served in the same manner in suits brought in the United States court." *Mohr & Mohr Distilling Co.* v. *Ins. Co.* 12 FED. REP. 474, and authorities cited in the note thereto. These adjudications are conclusive of the question attempted to be raised in this case. The defendant is duly before the court, and it only remains to be determined how far, if at all, the complainant is entitled to relief upon the facts herein stated.

Railroads are potential agencies, constitute a very considerable part of the national wealth, and deserve to be fully protected in all their chartered rights. But while they are essential to the continued prosperity and to the further development of the varied resources of this great country, they are susceptible, when manipulated in the interest of selfish schemes, of being perverted to the most unjust and oppressive uses. They necessarily monopolize all inland carrying business, and if unrestrained can, by unjust discriminations, favor some individuals and communities to the very serious detriment of others. Hence the frequent efforts made to control them in the interests of individuals and communities. By establishing or abandoning a depot they can depreciate or enhance the value of private property, and by extending or withholding facilities increase the profits or inflict losses on all persons engaged in commercial or other pursuits dependent on their favor. An advance of two cents per bushel on the grain annually carried from the grain-producing west to the eastern cities, with a corresponding increase upon all other classes of freight, would impose a tax upon the industry of the country exceeding in amount the annual levies made by congress for the support of the national government. If permitted, they can so regulate their freight charges as to exact from each locality dependent upon them the utmost farthing which the circumstances of each particular case and the absence of wholesome competition enable them to impose. For instance, where competition is sharp, they can carry passengers and freight over their entire lines for less than they charge for short intermediate distances, simply because in the one case they are controlled by competition, and in the other, in absence of such competition, they have

it in their power to extort the utmost farthing which such intermediate business is capable of bearing. Those who have them in charge can organize side or collateral business enterprises, and so manipulate their roads as to seriously cripple their competitors and add to their own profits. These are but some of the possibilities incident to railroad management. Nevertheless, with all their capacity for injustice, they cannot be dispensed with. But are their duties and obligations to individuals and to the public to be measured by the judgment of the interested parties, using them to further their own selfish schemes, or by the courts? And if by the latter, to what extent may the courts go in supervising their actions and in restraining abuses? These are grave questions, which we will now endeavor to answer.

The great and fundamental principle on which we rest the conclusions hereinafter stated is the conceded fact that railroad corporations are *quasi* public corporations dedicated to the public use. It is upon this idea that they have been invested with the power of eminent domain,— the authority to take and appropriate private property to their use by paying a just compensation therefor. They have been created for the purpose of exercising the functions and performing the duties of common carriers. Their duties and liabilities are defined by law. In accepting their charters they necessarily accept them with all the duties and liabilities annexed; that is to say, they undertake to construct the roads contemplated by their several charters; to keep them in good condition; equip them with suitable rolling stock and safe machinery; employ skilled and trustworthy laborers; provide suitable means of access to and egress from their trains; erect depots and designate stopping-places wherever the public necessities require them; supply, to the extent of their resources, necessary and adequate facilities for the transaction of all the business offered; deal fairly and impartially with their patrons; keep pace with improvements in railroad machinery, and adapt their service to the varying necessities and improved methods of doing business.

The granting and acceptance of such charter creates a *quasi* public trust, and clothes the public with an interest in the use of railroads, which can be controlled by the public to the extent of the interest granted therein. *Munn* v. *Illinois*, 94 U. S. 126 to 134, inclusive. But how and by whom can this *quasi* public trust be administered?

The defendant insists that relief cannot be given by this court. The contention is that all persons injured in their property or persons by the wrongful action or non-action of a railroad corporation

can have adequate relief in a court of law by a suit to recover damages for the wrong done, or by *mandamus* to compel a fulfillment of its corporate obligations. These remedies undoubtedly exist; but is there no other and better remedy for the redress of such wrongs? Suppose defendant should entirely suspend its operations and refuse to run trains upon its road, it would be in default, and everybody injured thereby could sue and recover the specific damages sustained. But is the public without redress, and are the courts without power to interfere, at the instance of one or more individuals, and protect the public as well as individuals from the threatened deprivation of the benefits and advantages intended to be provided by the building of the road? Or suppose the defendant should ignore the claims of some populous neighborhood, whose business justified and whose necessities required depot accommodations for the receipt and discharge of passengers and freight, and in this way force the people of such locality to transact their business through a depot eight or ten miles distant—is there no redress except through a multiplicity of suits to be prosecuted at law by each injured party, or such relief as could be obtained through the tardy and inadequate process of *mandamus*? These remedies exist. But they are not the only means of relief. The defendant, by accepting its charter, assumed certain obligations in favor of the public in the nature of a *quasi* public trust, and the duty of enforcing the execution of this trust, in the absence of some statute providing another and different remedy, devolves upon courts of equity. All matters of confidence and trust are within their peculiar cognizance. They may restrain or command, remove a trustee and substitute another in his stead, or execute the trust themselves, as the exigencies of each particular case may require. Their jurisdiction has been well established and defined. No court, I presume, exercising equity powers would hesitate, upon proper application, to command the defendant, in the contingencies supposed, to provide a depot or operate its road, for the obvious reason that the road was authorized and built for and dedicated to the public, and the public has a right to use it; and if the officers representing the corporation were to refuse to execute the trusts reposed in them, in the particulars mentioned, or in any other respect, it would be the imperative duty of the courts of equity, on due application, to interfere, and by an exercise of their extraordinary powers compel a faithful observance and discharge of all of its obligations. If these courts can lawfully do this, their supervising authority over such corporations to the extent of the public interest

in them is vindicated; that is, they can compel them to keep their roads, rolling stock, and machinery in good condition; force them to establish and maintain depots at suitable points where the business and public necessities require them; provide suitable means of access to and egress from their trains; forbid injurious discriminations; and, to the extent of their means, supply all the facilities for the safe transmission of persons and property contemplated by their charters. Their authority to do this was affirmed and applied in the recent litigation between the express and the railroad companies, in which the railroad companies admitted an obligation to receive, carry, and deliver express freight, but contended that they were only bound to do so when the freight to be carried was delivered into their custody to be carried in the usual way at their risk and on their freight trains, to be delivered by them to the consignees. But every court before which the question was argued held otherwise.

In the last of these cases, recently decided by Mr. Justice Miller and Judge McCrary at St. Louis, Missouri, the court ordered the railroad company, upon a motion for a preliminary injunction, to furnish the express company with suitable freight cars to be attached to its passenger trains for the transportation of its freight in care of its own messengers, and at the rates fixed by the court, thus recognizing in the fullest possible manner the authority of the court to supervise and control the action of the railroad company in the public interest.

Now, if it was competent for the court to thus interfere and control the railroad company in a matter of detail in its business affairs, why may I not, if the facts of this case justify relief, compel the defendant railroad company to make deliveries of live-stock consigned to complainant on the same terms and in the same manner as under like conditions deliveries are made by it to its co-defendant?

The business of receiving, feeding, dealing in, and forwarding live-stock is legitimate and necessary. To do so on a scale commensurate with the trade of Cincinnati in that line necessitates large expenditures in the erection of buildings and equipment of suitable yards; and, being both legitimate and useful, everybody engaging in it is entitled to equal facilities in the use of railroads, upon which they are largely dependent for success; for it is obvious if the railroads centering at Cincinnati, or the officials who control them, are permitted to combine and establish a stock-yard as a private enterprise, and by contract make it *the* depot of the roads for the receipt and delivery of all the stock brought to or carried through the city, and withhold like

accommodations from their competitors, they can suppress competition, and establish and maintain a monopoly in that particular department of trade, and subject the public to the payment of undue and unreasonable exactions for the services rendered.

I am very clear that no such right exists. Where a railroad company assumes to receive, take care of, water, feed, and forward stock as a part of its undertaking to transport them, as it may lawfully do, they are at liberty to select such agencies as they may choose to employ for the purpose, and the exercise of the right is no wrong to any one else. But that is not the question here. The complainant does not complain of defendant's transacting its business through its own agents. Its complaint is that the defendant refuses to deliver stock consigned to his yard to him, except through the yards of co-defendant, and it is against this unauthorized and injurious discrimination that he seeks relief. The two yards are contiguous. They are both connected with the Cincinnati & Baltimore Railroad Company's road (over which the defendant is running its trains) by suitable switches. The railroad defendant can receive stock from and deliver stock to the one as easily as to the other, but refuses to do so. The discrimination is contrary to a sound public policy and injurious to the complainant. It gives to the United Railroad Stock-Yards Company important advantages in the receipt and shipment of stock, over the complainant—an injustice which no railroad company, in the exercise of its *quasi* public functions, ought to be permitted to inflict upon any one engaged in a lawful and necessary pursuit. The power to prevent such an abuse is, as we have already affirmed, vested in courts of equity until the legislature shall provide another and different remedy.

A preliminary injunction, corresponding in its scope with the restraining order heretofore issued, is therefore granted, on complainant's entering into a bond in the penalty of $20,000, with securities to be approved and accepted by the clerk, conditioned to prosecute the suit with effect, or in the event he fails to do so that he will pay the defendants all such damages respectively sustained by reason of the wrongful suing out of said injunction.

NOTE. The temporary restraining order was as follows: "It is therefore ordered by the court that the defendant railroad company shall, so long as said company shall continue to deliver stock to the United Railroads Stock-Yards Company, until the further order of the court, desist from making any discrimination between the complainant's yards and those of the United Railroads Stock-Yards Company, and shall receive all the stock consigned, or which

the shipper shall desire to consign, to said complainant's yards, and transport and deliver the same upon the same terms and in the same manner that stock is received and transported and delivered unto the United Railroads Stock Yards Company, upon giving bond in the sum of $20,000."

It may be noted, as a part of the history of this controversy, that the Marietta & Cincinnati Railroad Company, operating the Cincinnati & Baltimore Railroad, had established a switch to the United Railroads Stock-Yards, and made that its live-stock station for the city of Cincinnati, and refused to establish or permit the establishment of a switch to, or station at, the stockyards of the complainant in the principal case. That being the only road reaching the stock-yards of the complainant he was practically cut off from access to or from the railroads of the city. The Marietta & Cincinnati Railroad Company was in the hands of receivers appointed by the common pleas court of Ross county, Ohio. An application was made to Judge Baxter to compel the receivers to afford the complainant equal facilities with those accorded his competitor. As the receivers had been appointed by the state court, and its road and property were therefore under its control, his honor refused the application and remitted the complainant to the state court for redress. Afterwards application was made to the Ross county court, and, after full hearing, an order entered directing the receivers to afford to the complainant equal facilities with those granted to the rival yard. For a report of the decision of the Ross county common pleas court, which was delivered by Judge Minshall, see 7 Cincinnati Weekly Law Bull. 295.

See, on the subject of railroad discrimination, *Hays* v. *Pennsylvania Co.* 12 FED. REP. 309, and note thereto. Also the *Express Company Cases,* before Justice Miller and Judge McCrary, 10 FED. REP. 210, 869.—[REP.