CASE 18.—PROCEEDINGS BY CENTRAL STOCKYARDS COM-
PANY AGAINST LOUISVILLE & NASHVILLE R. R.
CO. Nov. 15, 1906.

# L. & N. R. R. Co. v. Central Stock Yards Co.

Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

SHACKELFORD MILLER, Judge.

From the judgment the defendant railroad company appeals—Affirmed.

1. Carriers—Discrimination—Persons Entitled to Sue.—Where alleged arbitrary and discriminating acts of a carrier in refusing to switch and deliver stock cars to a connecting carrier for transportation to complainant's stockyards operated to irreparably injure complainant's business, and such acts were violative of Cons'. Secs. 213, 214, prohibiting discrimination, the right to sue to restrain such acts was not limited to shippers of livestock and commission merchants, but extended to complainant as well.

2. Same—Injunction — Recurring Acts — Affirmative Relief.—Where alleged wrongful and discriminating acts of a carrier were of a daily recurrence, and their continuance would cause further and irreparable injury to complainant's business, complainant was entitled to an injunction to prevent the wrongs complained of, and to compel the carrier to perform its duty to complainant, without discrimination, as provided by Const. Secs. 213, 214.

3. Carriers—Delivery of Freight—Terminal Facilities—Constitutional Provisions.—Const. Sec. 213, provides that all railroads shall receive, transfer, deliver, and switch empty or loaded cars coming to or going from any railroad, etc., with equal promptness and dispatch, and without discrimination as to charges, preference, etc., and shall so receive, deliver, transfer and transport all freight from and to any point where there is a physical connection between the tracks of such company; but that the section shall not be construed as requiring any such carrier to allow the use of its tracks for the trains of another engaged in like business. Held, that such section made it compulsory on every common carrier to use its terminal facilities, in receiving, delivering, interchanging, trans-

L. & N. R. R. Co. v. Central Stock Yards Co.

ferring and transporting freight in carloads or less quantities at points of physical connection with other roads, for all alike, when so requested.

4. Same—Defenses—Inconvenience—Increased Expense.—The refusal of a common carrier to obey the mandatory provisions of Const. Sec. 213, requiring delivery and transfer of freight from and to any point where there is a physical connection between the tracks of such carrier and another road, without discrimination, cannot be excused on the ground that to observe such provisions would subject the carrier to inconvenience or increased expense.

5. Same—Terminal Facilities—Stockyards—Connecting Carrier. —Where complainant company furnished ample facilities for loading and unloading stock at its yards in L., which were located on another railroad line, so that a connecting carrier might deliver stock consigned to complainant's yards with equal safety as at its own yards, by delivering the cars so consigned to the carrier whose line ran to complainant's yards, the connecting carrier could be required to make such delivery, under Const. Sec. 213, requiring carriers to make delivery without discrimination from and to any point where there is a physical connection between the tracks of the company and the line of a connecting carrier.

6. Same—Construction.—Const. Sec. 213, requires all railroads to deliver and switch empty or loaded cars coming to or going from any other railroad with equal promptness and dispatch, and without any discrimination, and to receive, deliver, and transport all freight from and to any point where there is a physical connection between the tracks of such companies. Held, that such section should not be construed as only requiring the carrier to transfer and deliver to other carriers such cars as it might receive from other carriers, but requires such delivery of its own cars as well.

7. Same—Place of Delivery—Duty of Carrier.—Where rival stockyards, located in the outskirts of L., were some eight miles apart, the duty of a carrier to deliver stock in car load lots to a connecting carrier, to be transported to complainant's stockyard, to which such cars were consigned, as required by Const. Sec. 213, should not be determined as though such stockyards adjoined each other.

8. Same—Power to Regulate Carriers—Police Power—Constitutional Law.—The Constitutional Convention of the State not only had power to impose regulations on railroads within the State, requiring interchange of cars and switching at points of physical connection with other roads in receiving and delivering freight, and the use of their terminals for such service, as provided by Const. Sec. 213, but the performance of such duties might be properly compelled by legislative enactment alone, under the State's police power.

9. Carriers—Delivery of Freight—Connecting Lines.—It is the duty of a common carrier to accept and carry all freight ten-

dered it and to make delivery to the consignee if the desti-nation is on its lines, but, if destined to a point not on its lines, it must, nevertheless, accept and carry such freight to the end of its lines and there deliver it to the connecting car-rier, with the instructions of the consignor.

10. Same—Carriage for Other Carrier.—A common carrier is as much bound to carry for another common carrier as for other persons.

11. Same—Refusal to Deliver—Connecting Carrier—Defenses—Violation of Contract.—Refusal of a common carried to deliver stock in carloads to a connecting carrier for transportation to complainant's stockyards at a point of physical connection between the two roads, as required by Const. Sec. 213, cannot be justified on the ground that to do so would constitute a violation of a contract between the initial carrier and another stockyards company, entered into prior to the adoption of such constitutional provision. ·

12. Same—Contracts—Validity—Public Policy.—A contract by which defendant railroad company, agreed not to establish any other stockyards in a certain city, but to deliver all live-stock shipped over its roads and consigned to such city at stockyards controlled by the B. Company, etc., was void, as in violation of Const. Sec. 214, prohibiting preferential con-tracts for the receipt, delivery, or transportation of freight, and as against public policy.

13. Same—Special Privileges.—A common carrier, while entitled to regulate transportation of passengers and freight on its own road, cannot so operate its road or conduct its business as to give an undue advantage to certain individuals, to the exclusion of others, or to form a monopoly or stifle compe-tition.

14. Constitutional Law—Corporations—Franchises—Contract.—A railroad company takes its charter, holds its property and franchises, and operates its railroad subject to the conditions and limitations imposed by the State in its Constitution and General Laws, so that its charter is not such a contract as will excuse it from the performance of duties and regulations imposed by Const. Sec. 213, regulating the use of terminal facilities and the transportation and delivery of freight, thereafter adopted.

15. Same—Due Process of Law—Deprivation of Property.—Const. Sec. 213, requires all railroads to transfer, deliver, and switch empty or loaded cars coming to or going from any railroad with equal promptness and dispatch and without discrimina-tion, and to deliver, transfer and transport all freight from and to any point where there is a physical connection between the tracks of such carrier and those of a connecting carrier, Held, that the performance of the duties imposed by such sec-tion did not deprive the carrier of his property without due process of law, though the performance thereof put the carrier to an increased expense and necessitated its parting with the possession and control of its cars for a reasonable time, while they were in possession of a connecting rival carrier.

L. & N. R. R. Co. v. Central Stock Yards Co.

16. Carriers—Switching Duties—Performance.—Where a carrier had agreed to perform switching duties imposed by Const. Sec. 213, and was willing yet to perform such duties for all other railroads, except with reference to livestock consigned to complainant's stockyards, it could not claim to be relieved from the duty of switching the stock on the theory that such switching was an unreasonable use of its cars.

17. Same—Connecting Carriers—Delivery of Cars.—Where a carrier delivers its cars to a connecting carrier for transportation of stock to a stockyard, it is entitled to charge a reasonable amount for the use of its cars and, if they are not returned within a reasonable time, it may sue the connecting carrier for damages or obtain a mandatory injunction to compel a return of the cars.

18. Commerce—Interstate Commerce — Delivery of Stock— Where, after the arrival of stock in the carrier's "break-up" yards, at the point of destination, the shipper demanded that the stock be delivered in the car to a connecting carrier, with whose road the initial carrier had physical connection, for shipment to another point within the State, such reshipment did not constitute interstate commerce, though the original shipment was from a point without the State.

19. Same—Statutes.—Const. Sec. 213, requiring interchange and switching of cars between connecting carriers in the transfer and delivery of freight, is not invalid as an interference with interstate commerce; its effect on such commerce being purely incidental and indirect.

20. Courts—Rules of Decision—State Constitution—Construction. —The construction of a State constitutional provision or statute by the highest court of such State is conclusive on both the State and Federal tribunals, provided such construction does not conflict with some provision of the Federal Constitution or statutes.

21. Carriers—Regulation—Police Power—State Statutes. — Ky. St. 1903, Secs. 818, 819. prohibiting discrimination by common carriers and providing penalties therefor, was but a further exercise of the State's police power to regulate carriers and designed to provide a means of compelling obedience to the mandatory provisions of Const. Sec. 213, relating to the same subject.

BARKER, J., Dissenting.

HELM, BRUCE & HELM and CHARLES N. BURCH, for appellant.

W. M. SMITH and DODD & DODD for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

In this action the appellee, Central Stockyards Company, sought and was granted by the court below

a mandatory injunction against appellant, Louisville & Nashville Railroad Company, compelling it to switch and deliver to the Southern Railway Company in Kentucky, at points of connection between the tracks of the two railroads, in or near the city of Louisville, certain car loads of live stock which had been shipped over appellant's road to appellee, and also requiring appellant, in like manner, to make future delivery of like freight shipped over its roads and consigned to appellee, or that might be offered it for shipment and delivery to appellee's stockyards. The plant of appellee, known as the "Central Stockyards," is located upon the line of the Southern Railway in Kentucky, about nine miles from its terminus in the city of Louisville, near and outside the city limits. The plant is modern and well equipped for appellee's business, which is that of feeding, watering, loading, unloading, and handling live stock of every description on commission. The break-up yards of appellant railroad company are near the intersection of Fourth and C. streets, in South Louisville, and not more than 100 yards from appellee stockyards. At the point indicated the tracks of appellant and those of the Southern Railway intersect. At Seventh and Magnolia streets, about 1½ miles northeast of the break-up yards, there is also physical connection by switch between the tracks of the two railroads, and for quite a while it has been their custom to transfer cars at this place of connection. It appears that appellant's lines of railroad extend through more of the counties of Kentucky than those of any other railroad operated in the State, that these are the counties in which live stock is principally raised, and that more than 50 per cent. of all the live stock raised in the State can only reach the stock markets over appellant's line.

It is charged in the petition that appellant has declined to receive, and announced its purpose to continue to reject, at any station on its line any live

stock billed or to be transported, transferred, or switched to the Southern Railway Company, or any other connecting carrier at Louisville, for delivery by such railway or carrier to appellee stockyards, and that in keeping with its past conduct and future intentions in this regard appellant has distributed printed circulars throughout the country advising stock shippers and dealers not to ship, and instructing its station agents and employes not to receive, bill, transport, transfer, or switch, any live stock at or to any of the points of physical connection between its lines and those of the Southern Railway Company in Kentucky, at Louisville, for delivery by that company to appellee, or at its yards, and that appellant will receive, bill, and transport to Louisville live stock tendered it for shipment to appellee or to any person at its stockyards, but when such stock reaches Louisville it refuses to deliver it to the connecting common carrier, the Southern Railway Company, or to deliver to the latter company the instructions of the consignor, and in all such instances, over the protest of the consignor, makes delivery thereof to the Bourbon Stockyards Company in Louisville, a rival and competitor in business of appellee, whose place of business is at a point distant several miles from that of appellee. It is further alleged in the petition that the acts and conduct of appellant complained of were and are violative of the provisions of Sections 213 and 214 of the State Constitution, and otherwise unlawful, arbitrary, and discriminative against appellee and other persons doing business with it; that the injury thereby inflicted was and is of a continuing and irreparable character, not susceptible of actual pecuniary estimation; that resort to actions at law will involve a multiplicity of suits which would not end the litigation; and that the only available or adequate remedy is that which may be afforded in equity and by injunction.

The answer, as amended, interposes the following matters of defense: (1.) That appellee cannot main-

tain the action, though the shipper, if injured by the
acts complained of in the petition, may do so; (2)
that compliance on appellant's part with the require-
ments of Sections 213 and 214 of the Constitution
would not only put it to great inconvenience and de-
lay its traffic, but the switching to be performed would
entail unreasonable and extraordinary expense; (3)
that having established the Bourbon Stockyards, with
its facilities for the handling, feeding, and caring for
all live stock shipped to Louisville, it is not required
to establish or help maintain any other live stock
depot in Louisville; (4) that to compel it to recognize
the right of owners, consignors, and consignees to
change destination in transitu would be an interfer-
ence with, or regulation of, interstate commerce, and
therefore violative of the Federal Constitution and
interstate commerce act; (5) that its charter forbids
any other company, or any person, to use its road,
and makes it unlawful for them to do so, and that
in accepting the charter it entered into a contract
with the State, which contract is violated by the pro-
visions of Sections 213 and 214 of the Constitution;
(6) that to compel it to perform switching duties in
conformity with Sections 213 and 214 State Consti-
tution, and the injunction granted by the court, would
be to exact of it performance, at less than the cost
thereof, of switching duties which can only be re-
quired of a transfer company; and this will amount to
the taking of its property without due process of
law, contrary to the provisions of the Constitution,
particularly the fourteenth amendment thereof; (7)
that to compel it to perform switching duties as re-
quired by the provisions of the State Constitution,
supra, would necessitate its parting with the posses-
sion and control of its cars to another and com-
peting company, and in effect thereby deprive it of
its property without due process of law.

No reason is perceived for sustaining appellant's
contention that this action cannot be maintained by
appellee. It will not do to say, as argued by counsel,

that only shippers of live stock or commission merchants injured by the conduct of appellant complained of may maintain an action against it. If the alleged arbitrary · and discriminatory acts of appellant set forth in the petition have injured appellee's business in the manner and to the extent therein averred, and such acts were violative of the provisions of the State Constitution, it goes without saying that it may maintain an action against the wrongdoer, without regard to any injury that may have resulted to any of its patrons from the same acts or to their right to sue therefor. Moreover, if the alleged wrongful acts of appellant were of daily recurrence, and their continuance would cause ,further and irreparable injury to appellee's business, as charged, it made no mistake in applying through a court of equity for the writ of injunction to prevent the wrongs complained of, and at the same time to compel appellant as a common carrier to perform the duties it owes appellee and its patrons, under and by virtue of the provisions of the Constitution. Obviously, a separate action for the damage occasioned by each wrong would involve appellee and appellant, as well, in a multiplicity of suits, none of which would necessarily end the litigation. Besides, the injury to appellee's business being of a continuing character, it is not susceptible of accurate pecuniary estimation. For these reasons, appellee, in bringing this action, availed itself of the only means of obtaining adequate relief. A court of equity will not interfere by injunction where there is an adequate legal remedy, but where there is no adequate legal remedy, and the ends of justice require it, it will do so to prevent irreparable injury. And by the express provisions of the Civil Code of Practice (Sections 271-276) the injunction may be preventive, or if necessary, mandatory; that is, affirmatively direct the party enjoined to do the thing or act necessary or proper to be done. Mason, etc., v Byrley, 84 S. W. 767, 26 Ky. Law Rep. 487; Interstate Stockyards Company v. Railroad Cos. (C. C.)

99 Fed. 483; L. & N. R. R. Co. v. P. & K. Coal Co., 111 Ky. 960, 23 R. 1318; 64 S. W. 969, 55 L. R. A. 601, 98 Am. St. Rep. 447; Bedford Bowling Green Stone Co., etc. v. Oman, etc., 115 Ky. 369, 73 S. W. 1038, 24 R. 2274. In view of the averments of the petition, we conclude that the interest of appellee as consignee and the party injured by the discrimina· tion complained of is sufficient to entitle it to main· tain the action.

Appellee bases its right to the relief asked in this case upon Sections 213 and 214 of the State Constitution, which read as follows:

"Sec. 213. All railroads, transfer, belt lines and railway bridge companies, organized under the laws of Kentucky, or operating, maintaining or controlling any railroad, transfer, belt lines or bridges, or doing a railway business in this State, shall receive, transfer, deliver and switch empty or loaded cars, and shall move, transport, receive, load or unload, all the freight in car loads or less quantities, coming to or going from any railroad, transfer, belt line, bridge or siding thereon, with equal promptness and dispatch, and without any discrimination as to charges, preference, drawback, or rebate in favor of any person, corporation, consignee or consignor, in any matter as to payment, handling or delivery; and shall so receive, deliver, transfer and transport all freight as above set forth, from and to any point where there is a physical connection between the tracks of said company;. but this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of another engaged in like business.

"Sec. 214. No railway, transfer, belt line, or railway bridge company, shall make any exclusive or preferential contract or arrangement with any individual, association or corporation for the receipt, transfer, delivery, transportation, handling, care or custody of any freight, or for the conduct of any business as a common carrier."

Appellant's several contentions, and the claim of appellee to relief under these sections, require careful consideration of their provisions. We find that much of the evidence offered by appellant in support of its second contention is directed to showing that the cost of switching from Seventh and Magnolia streets, in the city of Louisville, to the Bourbon Stockyards, its live stock depot, is greater per car than the rate charged, for which reason, it insists, it cannot rightfully be subjected to the expense and inconvenience of doing the switching required by Section 213, supra. It appears from the evidence that appellant, prior to the erection of appellee's plant, in regulating its switching charges as to connecting carriers, had fixed the same at $3 per car from all points of physical connection between such other carriers and its own road to the Bourbon Stockyards. Later the charge was reduced to $2 per car, and after the erection of appellee's yards to $1 per car. It also appears that the switching here referred to is done from what are known as the "break-up" yards of the railroad; each railroad entering Louisville having its break-up yards at a terminal point. Here the road engine by which a freight train of numerous cars is brought in is uncoupled from the train and the train is "broken up" or separated with switch engines, which are used to carry the cars to some connecting line, industry, or other place to which they are consigned within the switching limits of the terminal point. It further appears that appellant has its break-up yards in South Louisville, 1½ miles distant from Seventh and Magnolia streets, at which point there is physical connection between the tracks of appellant and those of the Southern Railway Company where many cars are daily interchanged by the two systems for further transportation, or for delivery to different industries within the terminal switching limits of one or the other of the roads. In ruling upon the second contention of appellant, the chancellor held that this was purely a switching case under Section 213 of

the Constitution, which imperatively requires all common carriers to make freight deliveries at Louisville and other terminal points, to one and all alike without discrimination.    Therefore the question of whether such a service could be conveniently performed by appellant, or that of regulating or fixing its switching charges, was not involved, though, as to the latter, it was further held that, inasmuch as appellant had voluntarily fixed the charge for such service, it could not reasonably complain that it was not remunerative.

We are now to determine whether these conclusions of the lower court are correct.   What is the object of Sections 213 and 214 of the Constitution? Judging from what was said upon this question in the Debates of the Constitutional Convention (volume 4, pp. 5118-5162, inclusive), it is manifest that these sections were specifically designed to cover just such a state of case as is here presented.   This, we think, apparent from the references made in debate by members of the convention to previous refusals of appellant railroad company to receive, bill, transfer, or to deliver live stock to the Kentucky & Indiana Stockyards Company, an industry similar to that of appellee, which was then located on the Kentucky & Indiana Company's tracks in the city of Louisville. In the progress of the debate it seemed to be conceded that under common-law principles, or Section 3 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]) some of the Federal courts had held that a railroad company had the right to make exclusive contracts for live stock deliveries, as claimed by appellant; but the fact that it had been so held was urged as a reason why the convention should adopt Sections 213 and 214, and thereby put into the Constitution in express terms such a provision as would prevent common carriers from discriminating against any consignee at a terminal point.   The last clause of Section 213, though taken from the interstate commerce act, differs from

it in one essential particular. The third section of the interstate commerce act concludes with this language: "But this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier in like business." The last clause of Section 213, State Constitution, is as follows. "But this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of another engaged in like business." It will at once be discovered that the words "or terminal facilities," appearing in the act, are omitted from Section 213 of the Constitution. This omission, as the proceedings of the convention indicate, was designedly made, and the section as a whole intended to make imperative the duties therein required of common carriers, regardless of the previous decisions of the courts; that is to say, in adopting the section, supra, it was the manifest purpose of the framers of the present Constitution to make it compulsory upon every common carrier to use its terminal facilities in receiving, delivering, interchanging, transferring, and transporting freight in car loads, or less quantities, at points of physical connection for all alike, when so requested. If the State has the power to impose reasonable regulations for the government of railroads and other common carriers doing business within its borders, and one of the reasonable requirements of its organic law as to the former is that they shall use their terminal facilities for the benefit of the public to transport, transfer, switch, and deliver freight to all alike, it necessarily follows that, if they wrongfully refuse to perform these duties, they may, upon a proper showing of their recalcitrancy, be compelled by the courts to do so. As said by this court in Commonwealth v. L. & N. R. R. Co., 120 Ky. 91, 85 S. W. 712, 27 Ky. Law Rep. 497: "Railroads are creatures of the law, invested with certain powers to promote the public interest, for which reason they may be required to conduct their affairs in furtherance of the public objects of their creation, and

it is because of this public character that courts as-
sume jurisdiction to enforce the public duties re-
quired of them.'' The following more elaborate state-
ment of the same doctrine will be found in Gladson
v. State of Minnesota, 166 U. S. 435, 17 Sup. Ct. 627,
41 L. Ed. 1064, which is quoted with approval in the
opinion of the case, supra: ''A railroad corporation
created by a State is for all purposes of local self-
government a domestic concern, even when its road
connects, as most railroads do, with railroads in other
States, and the State which created the corporation
may make all needful regulations of a police char-
acter for the government of the corporation while
operating its road in that jurisdiction. It may pre-
scribe the location of the place of construction of the
road, the rate of speed at which trains shall run, and
the places at which they shall stop, and make any
other reasonable regulation for their management,
in order to secure the objects of the corporation, and
the safety, good order, convenience, and comfort of
the passengers, and of the public. All such regula-
tions are strictly within the police power of the State.
* * *'' Lake S. & M. S. Ry. Co. v. Ohio, 173 U. S. 285,
19 Sup. Ct. 465, 43 L. Ed. 702.

Appellant's refusal to obey the mandatory provis-
ions of the Constitution contained in Section 213 can-
not be excused upon the ground that to observe them
would subject it to inconvenience or increased ex-
pense. In Commonwealth v. L. & N. R. R. Co., supra,
the railroad commissioners were sustained by this
court in a ruling requiring the railroad company to
so operate its trains as to accommodate local travel
between Shelbyville and Christiansburg. It was con-
tended by the company that obedience to the order
of the railroad commissioners would compel it to
violate a contract it had made with the Chesapeake &
Ohio Railroad Company, whereby it had leased to that
company for a term of years the exclusive control and
occupancy of its road between the points named for
the use of its through passenger trains only, and,

further, that, if itself compelled to operate trains on that part of its road, it would be subjected thereby to great pecuniary loss. In response to these contentions, and in concluding its reasons for rejecting them, the court, in part, said: "But in any event appellee cannot be permitted to escape the performance of any duty or obligation imposed by its charter or the general laws of the State by transferring its road, or any part thereof, to a lessee, or upon the ground that its own operation thereof will occasion loss to it." In C. & N. W. R. R. Co. v. People, 56 Ill, 376, 8 Am. Rep. 690, the railroad company attempted to excuse its refusal to make a delivery of grain at the plaintiff's elevator upon the ground of additional expense. In considering this defense, the Supreme Court of Illinois said: " * * * The only allegations made in the return for the purpose of showing any difficulty in delivering to relator's elevator the grain consigned thereto from the Wisconsin and Milwaukee divisions is that those divisions connect with the line on West Water street only by a single track, and that respondent cannot deliver bulk grain or other freight to the elevator of relator, even from those divisions, without large additional expense caused by the loss of the use of motive power, labor of servants, and loss of the use of cars, while the same are being delivered and unloaded at said elevator and brought back. As a reason for nondelivery on the ground of difficulty this is simply frivolous." It is not insisted by appellee that appellant should deliver at its stockyard live stock carried to Louisville on its lines and consigned to appellee by the shippers, but only that it be required to deliver cars containing such stock at points of physical connection between its tracks and those of the Southern Railway Company in or near Louisville, in order that the latter company may deliver them to appellee at its stockyards, which are approached and surrounded by its tracks and switches.

Consideration of appellant's third contention is unnecessary. It may be conceded that, having established the Bourbon Stockyards as a place for receiving and caring for live stock, it cannot be required to furnish more than one live stock depot in the city of Louisville, but we do not think that question is involved in this case, for appellee does not rest its claim to relief on any right conferred by the common law, but upon the mandatory provisions of the Constitution, which leads us to consider whether this case belongs to the class designated "stockyard cases proper" in the written opinion of the chancellor, or to the other class referred to therein as cases "involving interchange of cars at physical connection of railways." The rule he deduces from the authorities as to the first class is "that where the carrier furnishes its own stockyards, either by building them itself, or adopting the yards of another, it cannot be compelled under the common law or the interstate commerce act to furnish any other stockyard, or appliances therefor, for loading or unloading live stock at any other point in the city upon its own lines than at its own yards." As to the second class, or cases involving interchange of cars at points of physical connection between railroads, the opinion of the chancellor states the rule thus: "Where ample facilities for loading, and unloading are furnished by another line, and yards are there erected on the other carrier's track, so that the carrier may deliver stock with equal safety at said yards, then such delivery may be required certainly under our Constitution, if not at common law. If this latter proposition is put in doubt by some conflict of authority, under the common law, it is certain that, wherever there is a statutory or constitutional enactment looking to a prohibition of any discrimination in regard to the delivery, handling, care, and custody of freight, there can be no such discrimination, and similar treatment may be demanded by all in the same business." We

think the rule last stated applicable to the case at bar, though counsel for appellant contend that it is not, and cite the following authorities, which, it is insisted, support their view: Central Stockyards Co. v. L. & N. R. R. Co., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565; Covington Stockyards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, 35 L. Ed. 73; Butchers' & Drovers' Stockyards Co. v. L. & N. R. R. Co., 67 Fed. 35, 14 C. C. A. 290. These, as we will presently endeavor to show, were purely stockyard cases, decided upon supposed common-law principles, without respect to Section 213 State Constitution, for which reason we do not accept them as authority in point.

It is, however, earnestly argued by counsel for appellant that the case of Central Stockyards Co. v. L. & N. R. R. Co., supra, is an adjudication directly in point, but this claim does not appear to be conclusive, as the following excerpts from the opinion of the Supreme Court in that case will show: "We also lay on one side the question whether the section of the Constitution of Kentucky is or is not invalid, as an attempt to regulate commerce among the States; for we are of opinion that the defendant's conduct is not within the prohibition or requirement of either the act of Congress or the Constitution of Kentucky, as those provisions fairly should be construed. * * * We have discussed the case as if the two stockyards were side by side. They were not, but they were both points of delivery for cattle, having Louisville for their general destination. They both were Louisville stations in effect. It may be that a case could be imagined in which a carriage to another station in the same city by another road fairly might be regarded as a bona fide further transportation over a connecting road, and within the requirements of the Kentucky Constitution. However that may be, we are of opinion that the court below was entirely right, so far as it appears, in treating this as an ordinary case

of stations at substantially the same point of delivery, and therefore as one to be dealt with as if they were side by side.'' It is patent the Supreme Court expressly declined to apply either the Constitution of Kentucky or the interstate commerce act to the case before it, and in so holding incidentally declared the defendant's conduct was not within the prohibition or requirements of either the State Constitution or the act of Congress, though admitting in* a subsequent paragraph of the opinion that a case might arise in which carriage to another station in the same city by another road might be regarded as a bona fide further transportation over a connecting road, and within the requirements of the Kentucky Constitultilon. We do not think the opinion, supra, is to be understood as limiting the duty of a common carrier under Section 213 to that of only receiving cars of other roads coming to such common carrier, for the court did not construe or apply the section, and we will not presume that it intended an interpretation not justified by the language of the section. The wording of the section with respect to all common carriers is that they ''shall so receive, deliver, transfer and transport all freight as above set forth from and to any point where there is physical connection with the tracks of said companies.'' Nor do we think the language, ''shall receive, transfer, deliver and switch, empty or loaded cars,'' appearing in this section, means that a common carrier shall be required to transfer and deliver to other carriers only such cars as it may receive of such other carriers. Such a narrow construction would allow each railroad company to say that it would not part with its own cars. Consequently there would be no cars to receive. The cases of Butchers' & Drovers' Stockyards Co. v. L. & N. R. R. Co., 67 Fed. 36, 14 C. C. A. 290, and Covington Stockyards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, 35 L. Ed. 73, relied on in this connection by appellant's counsel, throw little light upon the

L. & N. R. R. Co. v. Central Stock Yards Co.

questions here involved. The first was, as stated in the opinion, an action "* * * to compel it (the Louisville & Nashville Railroad Company) to build a spur track connecting with complainant's yards." Consequently it presents no question involved in the case at bar. The other only holds that a carrier, having established its own stockyards, cannot be required under the common law to furnish another for loading or unloading stock at any other point in the city. In point of fact, it differs from the case at bar, in this: Keith was the proprietor of stockyards in the city of Covington, "provided with all the necessary means of receiving, feeding, and caring for such stock as he purchased, or as might be consigned to him by others for sale." His business, therefore, was that of "buying and selling on commission, as well as on his own account, live stock, brought to and shipped from Covington over the Kentucky Central Railroad." He was maintaining his own private stockyards for his own use. Whereas, in the case at bar, appellee maintains public yards; its position with reference to its patrons and the public being that of a public warehouseman, ready to serve all alike, and care for all the stock that may come. Appellee does not buy and sell stock, but only yards and cares for it. Appellant may, under ordinary circumstances, have the right to compel a private individual to accept, a delivery of live stock at its own yards, but we do not think it has the right to enter into a preferential contract with one public stockyards which obligates it to make of such stockyards a monopoly, and by that means destroy or cripple another public stockyards equally well equipped for handling and caring for live stock, and having an equal right to require the delivery of live stock by appellant to it.

It is also contended for appellant that this court in L. & N. R. R. Co. v. Commonwealth, 108 Ky. 628, 57 S. W. 508, 22 R. 328, construed the constitutional provision involved in this case as in harmony with Butch-

ers' & Drovers' Stockyards Co. v. L. & N. R. R. Co., and Covington Stockyards Co. v. Keith, supra. We think counsel err in this conclusion, for in L. & N. R. R. Co. v. Commonwealth the controversy was as to rate discrimination, which necessitated a construction of Section 215 of the Constitution, in connection with Section 214, and others of the same instrument; the former being the section under which the railroad company was indicted. The point decided in that case was that the rigid inhibition as to preferential exclusive contracts contained in Section 214 was modified by the qualifying phrase "upon the same conditions," found in Section 215. No such question is here involved.

We think the further contention of appellant that the Bourbon Stockyards and those of appellee should be treated as if they were side by side untenable, because, as a matter of fact, they are not side by side. The proof shows by actual measurement that the distance from the Bourbon Stockyards to that of appellee by the route over which live stock must pass is about eight miles, or, to be more specific, the distance from appellee's yards to Seventh and Magnolia streets is 2 1-10 miles; from the latter point to South Louisville is 1 71-100 miles, from South Louisville to the switch at East Louisville, from which point stock is carried to the Bourbon Stockyards, is 3 94-100 miles, and from the switch at South Louisville to the railroad pens at the Bourbon Stockyards the distance is from 800 to 900 feet. The addition of these distances will make the full distance between the two stockyards about eight miles. We think, therefore, that it would not do violence to the rights of the parties litigant to assume that these yards are not side by side, and should not, in our opinion, be so regarded. Moreover, it would seem unreasonable to say that the moving of freight within the territory of a populous city like Louisville, proximately, if not actually, a distance of eight miles, is further trans-

portation even in the meaning of the statement quoted above from the opinion of the Supreme Court in Central Stockyards Co. v. L. & N. R. R. Co., supra. At any rate, it should be so regarded, unless we are to conclude that further transportation can only mean transportation to another city, or some point of delivery other than that to which the freight is consigned, which we are not prepared to concede. In our opinion, not only had the constitutional convention the power to impose regulations upon all railroads within the State, requiring interchange of cars and switching at points of physical connection, in receiving and delivering freight, and the use of their terminals for such service, as manifestly contemplated by Section 213, but under the general police power of the State performance of such duties may be compelled by legislative enactment alone. This doctrine is recognized in L. & N. R. R. Co. v. Pittsburg & Kanawha Coal Co., 111 Ky. 960, 64 S. W. 969, 23 R. 1318, 55 L. R. A. 601, 98 Am. St. Rep. 447, wherein it is said: "As incidental to the operation of a railroad, it has the power to interchange cars with a connecting carrier, and such is the ordinary and usual way of doing business between common carriers, and the overwhelming weight of authority is to the effect that common carriers may by constitutional requirement, or legislative enactment, be compelled to interchange cars the one with the other for delivery on the line of the one or the other to the named consignee." In L. & N. R. R. Co. v. Williams, 95 Ky. 199, 24 S. W. 1, 15 R. 31, 44 Am. St. Rep. 214, it was held that, although Section 213 of the Constitution required railroad companies to receive by transportation cars belonging to other companies, still, if such cars are so constructed as to render it unsafe to handle them in the ordinary mode, it is the duty of the company to refuse to receive them. Conversely expressed, the necessary meaning of the above judicial conclusion is that, if a car offered to the

connecting carrier is not unsafe, the latter is by the
provision of the section, supra, compelled to receive
it. In Burlington, C. R. & N. R. R. Co. v. Dey, 82
Iowa, 336, 48 N. W. 98, 12 L. R. A. 436, 31 Am. St.
Rep. 477, the Supreme Court of that State, in uphold-
ing the constitutionality of a statute, containing pro-
visions similar to those of Section 213, Const. Ky.,
said: "The fact that the transfer of cars of one
company to another for the transportation of prop-
erty over more than one railroad without breaking
bulk has been practiced so long as to be recognized
as of the usual course of business, of which we will
take judicial notice (Peoria & P. U. Y. Ry. Co. v. Chi-
cago, R. I. & P. Ry. Co., 109 Ill. 139, 50 Am. Rep.
605), is a complete answer to the complaints made
in the objection under consideration. Surely a course
of business so long pursued and so extensively pre-
vailing and demanded by the commerce of the coun-
try cannot, when recognized and required by statute,
become so objectionable in principle, so oppressive
in operation, as to require the statute to be declared
unconstitutional. The railroad company as a common
carrier is required to receive and transport freight
offered it for transportation. The reasons upon which
this rule is founded impose upon it the obligation to
have cars of other companies brought to it for trans-
portation over its own road. As the course of busi-
ness of the railroad companies and the rules of law
require them to transport the cars of other compa-
nies, surely a statute prescribing and enforcing the
duty thus imposed cannot be regarded as interfering
with the constitutional guaranties for the protection
of the rights and property of such companies. Rail-
road corporations are quasi public corporations, dedi-
cated to the public use. In accepting their charters,
they necessarily accept them with all the duties and
liabilities imposed upon them by law. Thus a quasi
public trust is created, which clothes the public with
an interest in the use of railroads which can be con-

trolled by the public to the extent of the interest conferred therein." In Jacobson v. Wisconsin, Minn. & P. R. R. Co., 71 Minn., 532, 74 N. W. 893, 40 L. R. A. 392, 70 Am. St. Rep. 358, the Supreme Court of Minnesota, having under consideration a statute substantially like section 213 of our Constitution, said of its constitutionality: "We are clearly of the opinion that the Legislature has the power to compel a common carrier to do business in the ordinary and usual way, and therefore may compel such interchange of cars as incidental to the business for which the company was chartered." In Michigan C. R. R. Co. v. Smithson, 45 Mich. 221, 7 N. W. 795, Judge Cooley said of a like statute: "The necessities of commerce required this with such imperative force that there could scarcely be a more flagrant breach of corporate duty than would be a refusal to obey this law, and the interference of the State to punish could hardly fail to be speedy and effectual." In McCoy v. C., I., St. L. & C. R. R. Co. (C. C.) 13 Fed. 3, we find this statement of the same doctrine: "A railroad company cannot bind itself to deliver to a particular stockyard all live stock coming over its line to a certain point, but it is bound to transport over its road and deliver at such points reached by its tracks or connections all live stock consigned, or which the shipper desires to consign, to them upon the same terms and in the same manner as, under like conditions, it transports and delivers to their competitors; and the performance of this duty may be compelled by injunction at the suit of the proprietor of the stock yards discriminated against." In Coe v. L. & N. R. R. Co. (C. C.) 3 Fed. 778, it is said: "The facts suggest that very important inquiry, how far railroads called into being to subserve the public can be lawfully manipulated by those who control them to advance incidentally their own private interests, or depress the business of particular individuals or localities for the benefit of other persons or communities. As common carriers

they are by law bound to receive, transport, and de-liver freight offered for that purpose in accordance with the usual course of business. The delivery, when practicable, must be to the consignee." In Peoria & P. U. Y. R. R. Co. v. C., R. I. & P. R. Co., 109 Ill. 135, 50 Am. Rep. 605, the doctrine is also recognized in the following words of approval: "It is a matter of so much public concern that judicial notice may be taken of the fact that cars belonging to different companies are interchangeably used on all the railroads in the United States, and that no company could do any considerable freighting business that did not conform to this general usage. Without such usage, it would be difficult, if, indeed, it would be possible, to transact the commercial business of the country."

An examination of the following additional authorities will show that they are in accord with those from which we have so liberally quoted: Interstate Stock-yards Co. v. R. R. Cos. (C. C.) 99 Fed. 472; L. E. & St. L. Consol. Ry. Co. v. Wilson (Ind.) 32 N. E. 311, 18 L. R. A. 105; Railroad Co. v. Goodridge, 149 U. S. 680, 13 Sup. Ct. 970, 37 L. Ed. 986; Inman v. St. L. S. W. Ry. Co. (Tex. Civ. App.) 37 S. W. 37; B., C. R. & N. R. Co. v. Dey, 82 Iowa, 312, 48 N. W. 98, 12 L. R. A. 436, 31 Am. St. Rep. 477; Atchison, T. & S. F. R. R. Co. v. Denver & N. O. R. Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291; State v. Wabash, St L. & R. R. Co., 83 Mo. 144. In view of the fore-going authorities, we think it free from doubt that a common carrier may be required to make transfer of freight to the connecting carrier without breaking bulk, and that such is the customary way of trans-ferring live stock from the initial carrier to the con-necting carrier is abundantly shown by the evidence appearing in the record. This custom among common carriers is not only reasonable, and, as applied to the transportation of live stock, manifestly humane, but it is indispensably necessary to the demands of commerce. Live stock, and what is called "perishable"

freight, damage quickly from travel, rehandling, and delay, and this well-known fact gave birth, doubtless, to the custom of transferring such freight by inter-change of cars where it is transported over more than one road; delivery being made by the first carrier at the end of its line to the connecting carrier; but, leaving out of view any question of appellant's duty under the common law, we have certain plain, unambiguous provisions of the State Constitution requiring of it the delivery, through another carrier at Louisville, with whose road it has physical connection, live stock consigned to appellee, and, if it be conceded that the Constitution is indefinite or even silent as to the precise manner in which such delivery shall be made, we find that, as a matter of custom, the usual and proper way to make such delivery is by the interchange of cars, and that this custom is observed by appellant with respect to other railroads, except in the matter of delivering through the Southern Railway to appellee live stock consigned to it over appellant's lines of road. In other words, where live stock is consigned to appellee over appellant's road, it arbitrarily refuses to deliver it, except at the Bourbon Stockyards, where it is unloaded from the cars, and to be taken from that point to appellee's yards, it must be reloaded on the cars and carried a distance of about eight miles, or driven on foot through the streets of Louisville, a distance of four miles. Either reloading or driving them through the city would cause injury to the stock by shrinkage and consequent loss to the shipper. This, it seems to us, is a wrong both to appellee and its patrons, and, if persisted in by appellant, would destroy appellee's business. The duty imposed by the provisions of the Constitution upon appellant to make delivery of live stock as demanded by appellee is not in our opinion affected by the fact that its performance will involve on appellant's part, or that of the connecting carrier, what are technically known as "switching movements;" for, as said in

Missouri Pacific Ry. Co. v. Wichita Wholesale Groc-
ery Company (Kan. Sup.) 40 Pac. 899: ''The distance
over which freight is hauled, whether in car loads or
less quantities, whether in its own cars, or that be-
longing to connecting carriers, can make no differ-
ence with the capacity in which the company acts. A
railroad transporting a passenger or car load of
freight one mile, using a switch engine for motive
power, is just as much a common carrier as if the
distance were a thousand miles by regular freight or
passenger train.'' Manifestly it is the duty of ap-
pellant as a common carrier to accept and carry all
freight tendered it, and to make delivery thereof to
the consignee, if the point of destination is on its
lines, but if destined to a point not on its lines, it
must, nevertheless, accept and carry such freight to
the end of its lines, and there deliver it to the con-
necting carrier, with the instructions of the shipper.

In Elliott on Railroads the common-law duty of
a common carrier is thus stated: ''As a general
rule no carrier is bound by law to accept and carry
goods beyond the terminus of its own line. In the
absence of any agreement, either express or clearly
implied, for transporation beyond its own line, the
common-law duty of an independent carrier is per-
formed by safely transporting the goods over its own
line and delivering them to the consignee or connect-
ing carrier, as the case may be. In such a case the
goods are to be delivered by the initial carrier to the
connecting carrier for further transportation. The
former is considered as a forwarding agent, rather
than a carrier, as to such further transportation, and
is not liable for the default of subsequent carriers. Its
whole duty is not always performed, however, by
merely tendering the goods to the connecting carrier.
If the latter refuses to receive them, it is generally
the duty of the initial carrier to notify the consignor
or the consignee without unreasonable delay, and to
store or otherwise take care of the goods for a rea-

sonable time while awaiting instructions. * * * So, where instructions are to be given to it with the goods to be transmitted to succeeding carriers, it is the duty of such initial carrier to duly transmit them to the connecting carrier.'' Elliott on Railroads, vol. 4, Sec. 1432. ''It is in general the duty of the initial carrier to obey the instructions of the ship-per as to the route, mode of carriage, and the like, and it should also transmit the instructions of the shipper to the connecting carrier.'' Elliott on Railroads, vol. 4, Sec. 1440. P. R. R. Co. v. Jones, 155 U. S. 333, 15 Sup. Ct. 136, 39 L. Ed. 176; Danna v. N. Y., etc., R. R. Co., 50 How. Prac. (N. Y.) 428; Little Miami R. R. Co. v. Washburn, 22 Ohio St. 330; Palmer v. C., B. & Q. R. R. Co., etc., 56 Conn. 137, 13 Atl. 818; Bosworth v. Chicago Ry. Co., 87 Fed. 72, 30 C. C. A. 541; Railroad Co. v. Mfg. Co., 16 Wall. (U. S.) 318, 21 L. Ed. 297; Vincent v. C. & A. R. R. Co., 49 Ill. 41; Coe v. L. & N. R. R. Co. (C. C.) 3 Fed. 778; In re Petersen (C. C.) 21 Fed. 889; North v. Transportation Co., 146 Mass. 315, 15 N. E. 779; M. S. & N. I. R. R. Co. v. Day, 20 Ill. 375, 71 Am. Dec. 278; Beers v. Wabash, St. L. & P. R. R. Co. (C. C.) 34 Fed. 244; L. & N. R. R. Co. v. Odill (Tenn.) 33 S W. 611, 54 Am. St. Rep. 820; McCoy v. C., I., St. L. & C. (C. C.) 13 Fed. 3. The right of the shipper to have his goods delivered to a connecting line is involved in the right to consign them as he chooses, and while he cannot require the initial carrier, at common law, to assume any obligation beyond its own lines, he can compel it to carry to the end of his line, and deliver according to the usual course. And we also think that a common carrier is as much bound to carry for another common carrier as it is to carry for other persons. Seasongood, etc., Co. v. Tenn & Ohio River Transportation Co., 54 S. W. 193, 21 Ky. Law Rep. 1144, 49 L. R. A. 270.

Appellant cannot justify the acts complained of upon the ground that they were required by its con-

tract with the Bourbon Stockyards, which would have been violated had it complied with appellee's demands as to the delivery of live stock to it. The contract in question was entered into by the parties prior to the assembling of the constitutional convention. It provides in specific terms for the establishment and proper maintenance of the Bourbon Stockyards as alleged in the answer, and the fourth clause thereof reads as follows: "First party agrees that it will not lease, rent or sell any of its ground, in the city of Louisville, for the establishment of a stockyard, or otherwise facilitate the establishment of a stockyard in said city, and it will establish no other stock depot in said city, and that it will deliver and cause to be delivered to the second party, so far as it legally may all live stock shipped over the roads of the first party and consigned to the city of Louisville, and should any live stock be shipped to other person or persons of the said city the first party hereby makes and agrees to make the stockyards of the second party the stock depot of the second party for said city and agrees to unload all live stock shipped to said city at the address of the second party, but if the provisions of this section of the contract be abrogated or invalidated by judgment of any court or by legislative requirement then the second party shall have no claim to damages arising out of or dependent on said provisions, and the second party shall, at is own costs and expense, defend any and all litigation which may arise out of the provisions of this section, and will hold the first party entirely harmless therefrom." Three things are apparent from the language of this clause of the contract, viz., that the parties at the time of its execution were themselves in doubt as to its validity; that appellant can sustain no loss, either by way of cost incurred in litigation arising from it or in the matter of damages to be paid the Bourbon Stockyards, in the event the contract should be abrogated by the judgment

of a court or by legislative requirement; and, finally, that the parties had in contemplation some early change in the laws of the State, organic or statutory, that might require the abrogation of this contract. That this is an exclusive and preferential contract, such as is expressly forbidden by Section 214 of the State Constitution, there can be no doubt, and likewise such as the courts everywhere have denounced as against public policy, because promotive of monopoly and hurtful to the public, as well as the person or persons sustaining special injury therefrom A similar contract was recently condemned by this court in the case of Bedford-Bowling Green Stone Co., etc., v. Oman, etc., 115 Ky. 369, 73 S. W. 1038, 24 R. 2274. One of the points of controversy was whether the Louisville & Nashville Railroad Company should be required to transport on its cars stone from appellee's quarry, which it had refused to do on the ground that by contract with the Bedford-Bowling Green Stone Company, a competitor of appellees and owner of a quarry side by side with theirs, it had obligated itself to use the switch connecting both quarries with the main track three miles distant only for the transportation of stone from the Bedford Bowling Green Stone Company's quarry; the latter company having purchased the switch with the quarry property from its grantor. In disposing of this contention of the railroad company, the court, through Judge Barker, said: "This contract and other evidence in the record bearing upon the question show that the Louisville & Nashville Railroad Company during the continuance of this last contract has the control and management of the railroad switch. It owns, controls, and operates the engines and other rolling stock which pass over the line. It keeps the railroad in repair and owns all the material which goes into it. So far as this record shows, it exercises the same control and dominion over this line that it does over any other part of its system, and we think by the

terms of the contract in question the switch, during the continuance of the contract at least, became a part of the general system of the Louisville & Nashville Railroad Company. This being so, it cannot lawfully refuse to receive and transport freight belonging to appellee to and from such reasonable points along the line at which they may lawfully ship or receive it." This was clearly settled by the opinion of this court in the case of the Louisville & Nashville Railroad Company v. Pittsburg & Kanawha Coal Co., 111 Ky. 960, 64 S. W. 969, 23 R. 1318, 55 L. R. A. 601, 98 Am. St. Rep. 447, in which it is said: "Railroad companies are quasi public corporations, created for the purpose of exercising the functions and performing the duties of common carriers. These duties are defined by law, and in accepting their charters they necessarily take with them all the duties and liabilities annexed; and they are required to supply to the extent of their resources adequate facilities for the transportation of all business offered and to deal fairly and impartially with their patrons. McCoy v. C., I., St. L. & C. R. R. Co. (C. C.) 13 Fed. 5; Munn v. Ill., 94 U. S. 136, 24 L. Ed. 77. And they have no right to contract with a corporation or individual to give exclusive rights to transfer any commodity over any part of their line." In L. & N. R. R. Co. v. Pittsburg & K. Coal Co., 111 Ky. 960, 64 S. W. 969, 23 R. 1318, 55 L. R. A. 601, 98 Am. St. Rep. 447, quoted with approval by the opinion in the case, supra, another such preferential contract was condemned in the following language: "In our opinion the contract with the Cannel Creek Coal Company, giving them exclusive use of the switch for coal purposes, was against public policy and absolutely void." In other cases brought to this court contracts of the character of that here assailed have been declared absolutely void. Commonwealth v. L. & N. R. R. Co.,

120 Ky. 91, 85 S. W. 712, 27 Ky. Law Rep. 497; Anderson v. Jett, 89 Ky. 375, 11 R. 570, 12 S. W. 670, 6 L. R. A. 390. And looking to the decisions of the courts of last resort of other States with respect to such contracts we find nearly all of them in harmony with our own; those here cited being strongly in point. Peoria & R. I. R. R. Co. v. C. V. M. Co., 68 Ill. 489; Munn v. Ill., 94 U. S. 126, 24 L. Ed. 77; McCoy v. Railroad Co. (C. C.) 13 Fed. 5; Inter Ocean Co. v. Associated Press, 184 Ill. 448, 56 N. E. 822, 48 L. R. A. 568, 75 Am. St. Rep. 184; Chicago & N. W. R. Co. v. People, 56 Ill. 365, 8 Am. Rep. 690; Sandford v. Railroad Co., 24 Pa. 382, 64 Am. Dec. 667; State v. Hartford & N. H. R. Co., 29 Conn. 538.

While a railroad company must be conceded the power to regulate transportation of passengers and freight on its own road, it cannot exercise it in such a manner as to unduly advantage certain individuals and exclude others, or to foster a particular industry by crippling another. It will not be allowed to so operate its road or conduct its business as to promote monopoly or stifle competition; for the one is necessarily hurtful to the public, and therefore against public policy, while the other is the best protection to the public. A railroad company is, therefore, without power to enter into a preferential or exclusive contract with any of its patrons. If possessed of such power, railroad companies might, as said by Judge Baxter in the Stockyards Case of Coe v. L. & N. R. Co., supra, "destroy a refractory manufactory, exterminate, or very materially cripple competition, and in large measure monopolize and control the several branches of useful commerce, and dictate such terms as avarice may suggest. We think they possess no such power to kill and make alive. Impartiality in serving their patrons is an imperative obligation of all railroad companies, equality of accommodation in the use of railroads is a legal right

of everybody. The principle is founded in justice and necessity, and has been uniformly recognized and enforced by the courts. A contrary idea would concede the railroad companies a dangerous discretion, and inevitably lead to intolerable abuses. It would to a limited extent make them masters, instead of servants, of the people. * * *'' It is apparent from the evidence appearing in the record in the case at bar that appellant's compliance with the Bourbon Stockyards preferential contract has given that company undue advantages over appellee and thereby injured the latter's business, and, if continued, will cause it greater injury. It is equally apparent from the evidence that the existing facilities of appellant to interchange traffic between its lines and those of the Southern Railway Company when it reaches Louisville leaves no difficulty in the way of the delivery to appellee of the live stock consigned to it over appellant's road. In response to appellant's fifth contention, it is only necessary to say that the switching and delivery of cars imposed upon it by Section 213 of the Constitution, and the judgment appealed from, do not violate any contract between it and the State created by its charter, or require the use of its tracks by the Southern Railway Company. Appellant is only required to switch its cars onto other tracks and to allow its cars to be thus used in the switching. The performance of such duties may, as held by the numerous authorities cited in the opinion, be required as incidental to the operation of the railroad. If a railroad company can be required, as a part of its service due the public, to transport the cars of another company over its lines, it may also be required to switch its own cars upon the track of another and connecting road for purposes of delivery. Appellant's charter provision, relied on as exempting it from the performance of the duties required by Section 213, supra, is not such a contract as will excuse it. No doctrine is better settled than that a railroad

company takes its charter, holds its property and franchises and operates its road subject to the conditions and limitations imposed by the State in its Constitution and general laws, and also subject to future constitutional provisions and future general legislation. As said by Mr. Justice Brown in Minneapolis & St. L. Ry. Co. v. Minnesota, 186 U. S. 261, 22 Sup. Ct. 900, 46 L. Ed. 1151: 'It is impossible for the State to exercise this power of regulation without interfering to some extent with the power of the railroad company to contract with either its customers or connecting lines." In Penn. R. R. Co. v. Miller, 132 U. S. 75, 10 Sup. Ct. 34, 33 L. Ed. 267, it was held that "neither the original charter of the railroad company nor subsequent acts conferring additional privileges constituted such a contract between the State and the company as exempted the latter from the operation of the subsequently adopted Constitution of Pennsylvania, that a constitutional provision as applied to the company in respect to cases afterwards arising did not impair the obligation of any contract between it and the State, and that the company took its charter subject to the general law of the State and to such changes as might be made in such general law, and subject to future constitutional provisions and future general legislation, since there was no prior contract with it exempting it from such enactment." Lou. Water Co. v. Clark, 143 U. S. 1, 12 Sup. Ct. 346, 36 L. Ed. 55; L. & N. R. R. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849.

We are unable to find any merit in the sixth and seventh contentions of appellant, that to require of it performance of switching would put it to increased cost and necessitate its parting with the possession and control of its cars into the possession of another and rival company, and thereby deprive it of its property without due process of law, contrary to the fourteenth amendment to the Constitution of the United

States.   These contentions we have already in effect
answered.   Neither in principle nor in fact will the
switching and delivery of cars demanded of appellant
deprive it of its property.   The duties to be perform-
ed are incidental to the transportation of freight in
bulk in the business of railroads, and requires only a
necessary and not unreasonable temporary use of
appellant's cars by the Southern Railway in unload-
ing stock at appellee's stockyards after its transporta-
tion over appellant's road has been completed.   That
such switching is not an unreasonable or an unusual
use of the cars of one company by another is made
plain by the agreement appearing in the record,
whereby the railroads of the country, including ap-
pellant, have agreed upon a uniform charge for rental
of their cars when used by their roads.   It is not
perceived that appellant can consistently demand to
be relieved of the performance of switching duties
required by the provisions of the State Constitution,
in view of its having already agreed to perform these
duties, and of its willingness to yet perform them,
for all other railroads that do not require live stock
to be switched to appellee's yards.   In the case of
L. & N. R. R. Co. v. Com. of Kentucky, 183 U. S. 513,
22 Sup. Ct. 95, 46 L. Ed. 298, we find the following
pertinent statement of the law as to the property
rights of a railroad company in its relations to the
State: "It is said that, while it is true that railroad
companies receive their rights to exist and to main-
tain their roads from the State, yet their ownership
of such roads is property, and as such is protected
from arbitrary interference by the State.   But,
though it be conceded that ownership in a railroad
is property, it is property of a kind that is subject
to the regulations prescribed by the State."   Appel-
lant's cars, like its roadbed and track, are property
held for public purposes.   Private property may be
taken for the construction of the railroad on the
ground that it is taken for public purposes, and,
when the railroad is constructed, it holds its prop-

erty for public purposes. It must serve the public, and cannot complain that its cars are used even by another railroad company, if it is done in the usual course of the railroad business and for the benefit of a consignor or consignee entitled to the transportation or delivery of freight in bulk and contained in such cars. If this is in a sense the taking of its property for private purposes, appellant must, as a common carrier, submit to it, for it is only a temporary and necessary use of its property. Appellant cannot suffer loss by such use of its cars. If it delivers its cars to the Southern Railway to be taken to appellee's stockyards for the loading or unloading of stock, that company has no right to detain them longer than a reasonable time for that purpose, and must return them. Appellant may charge a reasonable amount for the use of its cars, and if they are not returned, or if detained an unreasonable time, it may sue the delinquent road for damages, or apply to a court of equity for a mandatory injunction to compel the return of the cars. Indeed, it can suffer no loss which the law may not remedy. By the regulation between railroads, cars are interchanged from one road to another at a fixed charge. In brief, appellant's contention comes in substance to this: That it has a right to discriminate and not allow all roads for all purposes to use its cars. This is the very evil that the constitutional provision in question was intended to prevent.

Appellant's fourth contention, though laid aside until the others were disposed of, is not difficult of solution. Are the requirements that appellant shall recognize the right of owners, consignors, and consignees to change destination in transitu a regulation of interstate commerce and violative of the Federal Constitution, as claimed? On this subject Hutchinson on Common Carriers, Sec. 134, has this to say: "When there has been no agreement to ship the goods which will make the delivery of them to the

carrier a delivery to the consignee and vest the prop-
erty in him, the shipper may, even after the delivery
to the carrier and after the bill of lading has been
signed and delivered, or after the goods have passed
from the possession of the initial carrier into that
of a succeeding one, alter their destination and direct
their delivery to another consignee, unless the bill of
lading has been forwarded to the consignee first
named, or to some one for his use.    But after the
carrier or his agent has given one bill of lading or
receipt for the goods it cannot give another, unless
the first and all the duplicates have been returned
to him.''    Also in Section 337 it is said:    ''So long as
the goods remain the property of the bailor, he may
countermand any directions he may have given as to
their consignment, and may at any time during the
transit require of the carrier their redelivery to
himself; and, if such redelivery can be made without
too much inconvenience or expense to the carrier, he
will be bound to make it.    A carrier is employed as a
bailee of a person's goods for the purpose of obeying
his directions respecting them, and the owner is en-
titled to receive them back at any period of the jour-
ney where they can be got at.    To say that a carrier
is bound to deliver goods according to the owner's
first directions is a proposition wholly unsupported
either by law or common sense.    I can well under-
stand the case of goods being placed in such a posi-
tion that they cannot easily be got at, though it is usu-
ally otherwise.    But, if the goods are demanded by the
owner during the transit, when the carrier is willing
and able to fulfill the contract on his part, the latter
will be entitled to his full freight for the whole dis-
tance to the destination to which they were originally
directed, and any expense he may be put to in un-
loading.    If this be tendered and he refuse to restore
the goods, it will amount to a conversion.    The owner
cannot, however, it is said, change the destination
and require delivery somewhere else except upon the

basis of a new contract, after the carrier has completed his undertaking and carried the goods to the destination first agreed upon.'' Sutherland v. Second Nat. Bank, 78 Ky. 250; L. & N. R. R. Co. v. Hartwell, 99 Ky. 436, 18 R. 745, 36 S. W. 183, 38 S. W. 1041; Strahorn v. Union Stockyards & Transit Co., 43 Ill. 424, 92 Am. Dec. 142. We do not understand it to be denied by counsel for appellant that the consignor may change the consignee; but it is denied that he can change the destination, and insisted that, if the exercise of the right to change either requires of it the performance of the switching duties demanded by appellee under Section 213 of the Constitution, it will amount to a regulation of interstate commerce. When a shipment is made from another State and reaches appellant's break-up yards in Louisville, the shipper has a right to demand there his stock. When he does make this demand, the interstate shipment is ended, and, if he there demands it, he has a right, under the laws of this State, to have the stock delivered by appellant to another carrier with whose road it there has physical connection, to be shipped to another point in Louisville or within the State, upon reasonable charges. This shipment within the State is not interstate commerce. If in a shipment from Tennessee to Louisville the shipper had stopped the car at Elizabethtown, no doubt would exist of his right to take the stock, and, if he then shipped it to another point in the State, it would not be material that the first shipment was from Tennessee.

We are referred by the briefs of counsel to numerous authorities on this question, but we can take time to consider only such of them as we regard decisive thereof. One of the most pertinent of them is an excerpt from Mr. Justice Miller's discussion of the difference between State and interstate commerce: ''It may be thus stated: That the power to regulate commerce is one which includes many subjects, various and quite unlike in their nature; that

whenever subjects of this power are in their nature
national, or require one uniform system or plan of
regulation, they may be justly held to belong to that
class over which Congress has the exclusive power
of legislation; but that local and limited matters not
national in their character which are most likely to
be wisely provided for by such diverse rule as the
localities and the authorities of the different States
may deem applicable may be regulated by the Legis-
latures of those States in the absence of any act of
Congress upon the same subject." Lectures on the
Const. p. 454. It was said by Chief Justice Marshall
in Gibbons v. Ogden, 9 Wheat. 1-203, 6 L. Ed. 23: "It
is obvious that the government of the Union, in the
exercise of its express powers—that, for example,
of regulating commerce with foreign nations and
among the States—may use means that may also be
employed by a State in the exercise of its acknowl-
edged powers; that, for example, of regulating com-
merce within the States. * * * So, if a State, in passing
laws on subjects acknowledged to be within its con-
trol and with a view to those subjects, shall adopt a
measure of the same character with one which Con-
gress may adopt, it does not derive its authority
from a particular power which has been granted to
Congress, but from some other which remains with
the State, and may be executed by the same means."
That there has been no departure by the Supreme
Court from the above view of the question is clearly
shown by its later decisions, as, for example, it was
said by Mr. Justice Field in Mobile County v. Kim-
ball, 102 U. S. 702, 26 L. Ed. 238: "Perhaps some of
the divergence of views upon this question among
former judges may have arisen from not always bear-
ing in mind the distinction between commerce as
strictly defined and its local aids or instruments, or
measures taken for its improvement. Commerce
with foreign countries and among the States, strictly
considered, consists in intercourse and traffic, includ-

ing in those terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined, there can be only one system of rules applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible. Language affirming the exclusiveness of the grant of power over commerce as thus defined may not be inaccurate when it would be so if applied to legislation upon subjects which are merely auxiliary to commerce.'' In L. & N. R. R. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849, which was an action brought by the State to prevent the consolidation of certain railroads, it was contended by the railroad company that Section 201 of the Kentucky Constitution, which forbids the purchase by a railroad of a competing line, is a regulation of interstate commerce, and for that reason void. In rejecting that contention the court, through Mr. Justice Brown, said: ''But little need be said in answer to the final contention of the plaintiff in error, that the assumption of a right to forbid the consolidation of parallel and competing lines is an interference with the power of Congress over interstate commerce. The same remark may be made with respect to all police regulations of interstate railways. All such regulations interfere indirectly, more or less, with commerce between the States in the fact that they impose a burden upon instruments of such commerce, and add something to the cost of transportation, by the expense incurred in conforming to such regulations. These are, however, like the taxes imposed upon railways and their rolling stock, which are more or less, according to the policy of the State within which the roads are operated, but are still within the competency of the Legislature to impose. It is otherwise, however, with respect to taxes upon their

franchises and receipts from interstate commerce, which are treated as a direct burden. There are certain intimations in some of our opinions which might perhaps lead to an inference that the police power cannot be exercised over a subject confined exclusively to Congress by the Federal Constitution. But, while this is true with respect to the commerce itself, it is not true with respect to the instruments of commerce. * * * It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of commerce, so far as the legislation was within its ordinary police powers. Nearly all the railways of the country have been constructed under State authority, and it cannot be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable. In the division of authority with respect to interstate railways Congress reserves to itself the superior right to control their commerce and to forbid interférence therewith, while to the States remains the power to create and regulate the instruments of such commerce, so far as necessary to the conservation of the public interests.'' In L. & N. R. R. Co. v. Kentucky, 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298, it was contended by the railroad company that Section 213 of the State Constitution, forbidding a railroad's charging more for a short haul of freight than for a long one, was void because it interfered with interstate commerce. The court, Mr. Justice Shiras writing, unanimously declared: ''It is plain that the provision in question does not in terms embrace the case of interstate traffic. It is restricted in its operation to those who own or operate a railroad within the State, and the long and short distance mentioned are evidently dis-

tance upon the railroad line within the State. The particular case before us is one involving only the transportation of coal from one point in the State of Kentucky to another by a corporation of that State. It may be that the enforcement of the State regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce, that the interference with the commercial power of the general government, to be unlawful, must be direct, and not the mere incidental effect of enforcing the police powers of a State. N. Y., L. E. & W. R. Co. v. Penn., 158 U. S. 431, 15 Sup. Ct. 896, 39 L. Ed. 1043; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532, 41 L. Ed. 953. A discussion of this subject will be found in the opinion of this court in L. & N. R. R. Co. v. Kentucky, 161 U. S. 701, 16 Sup. Ct. 714, 40 L. Ed. 849, where the same conclusion was reached.''

The following additional authorities bearing upon the same question are in harmony with those, supra, viz.: N. Y., N. H. & H. R. R. Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853; Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; L. S. & Mich. S. Ry. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; Chicago, M. & St. P. Ry. Co. v. Becker (C. C.) 32 Fed. 849; Iowa v. Chicago, M. & St. P. Ry. Co. (C. C.) 33 Fed. 391—the two last being specific switching cases. The conclusion deducible from the foregoing authorities is that Section 213 of the Kentucky Constitution, requiring interchange and switching of cars, is a valid exercise of the police power of the State, that it is not intended to affect interstate commerce, and that such effect as it may have thereon is purely incidental and indirect; and, this being true, it is not to be regarded

as a regulation of interstate commerce within the
meaning of the Federal Constitution or interstate
commerce act. The Supreme Court long ago adopted
the rule that it would accept the construction of a
State constitutional provision or statute adopted by
the highest court of such State, provided they do not
conflict with some provision of the Federal Constitu-
tion or Federal statutes. Green v. Neal 6 Pet. (U. S.)
291, 8 L. Ed. 402; Fairfield v. Gallatin, 100 U. S. 47,
25 L. Ed. 544; Post v. Supervisors, 105 U. S. 667,
26 L. Ed. 1204; Leeper v. Texas, 139 U. S. 462, 11
Sup. Ct. 577, 35 L. Ed. 225; In re Duncan, 139 U. S.
499, 11 Sup. Ct. 573, 35 L. Ed. 219. As we under-
stand the decisions of the Supreme Court, it will in
a case like the one at bar apply the same test applied
by the State courts, which is whether or not the con-
stitutional provision or statutory provision, as the
case may be, can be enforced within the particular
State without affecting the railroad company with
respect to the performance of its duties in other
States. W. U. Tel. Co. v. James, 162 U. S. 650, 16
Sup. Ct. 934, 40 L. Ed. 1105; Lake S. & Mich. S. Ry.
Co. v. Ohio, 173 U. S. 309, 19 Sup. Ct. 465, 43 L. Ed.
702. Applying that test to the constitutional pro-
visions under consderation, it is, we think, manifest
that they do not regulate appellant's duties in any
other State, but only such as are purely local and
to be performed within this State. In other words,
these provisions are directed to the instrumentality,
and not against the commerce itself. It is a mere
exercise of that power of which Mr. Cooley says:
"It cannot be doubted that there is ample power in
the legislative department of the State to adopt all
necessary legislation for the purpose of enforcing the
obligations of railway companies as carriers of per-
sons and goods to accommodate the public impar-
tially, and to make every reasonable provision for
carrying with safety and expedition." Cooley's
Const. Lim. (6th Ed.) p. 715. The enactment of Sec-

tions 818-819, Ky. St. 1903, the latter providing penalties for a violation of the provisions of the former, was but a further exercise of this power of the State, and designed to provide a means of compelling obedience to the mandatory provisions of the Constitution contained in the sections, supra.

In our opinion the power of the State, by appropriate change in its organic law or by legislative enactment, to provide for the public convenience, stands upon the same ground as its power by such legislation to protect the public morals or the public safety. We would not be understood as holding that if appellant were required to deliver to appellee at a point of physical connection with the road of the Southern Railway Company, in Louisville, cars passing through Kentucky from one State into another, or cars received from a point in Kentucky for further transportation, by way of Louisville, into another State, it would not be an interference with interstate commerce or a regulation thereof. However, that question is not here presented for decision. It is only insisted that appellant be required to perform the duties of switching by a mere delivery, in the customary manner, of live stock to the consignee at the point of destination, in obedience to the instructions of the owner or shipper, and such service, we think, it should be required to perform whether the live stock is shipped over its lines to Louisville from a point within the State or brought there from another State. For the courts to compel the delivery by a common carrier of live stock to the consignee at the point of destination, according to the custom obtaining among railroads and in obedience to the demand of the consignor, whether the freight come from a point within or without the State, is not a regulation of interstate commerce. And, if the delivery of freight can thus be compelled, the carrier may also be required to receive it for such delivery at all stations on its lines within this State.

Judgment affirmed.

DISSENTING THE OPINION BY JUDGE BARKER.

The opinion of the majority of the court requires the Louisville & Nashville Railroad Company to turn over its cars, loaded with stock, to the Southern Railway Company, to be transported by it to the Central Stockyards Company, a depot on its line, there to be unloaded, without any requirement that the latter company shall pay for the use of the cars while it has them, and without any definite provision for their return to the owner after being unloaded. This, I hold, is taking private property in violation of our State Constitution and the fourteenth amendment to the Constitution of the United States. The Kentucky Constitution provides in Section 13 of the Bill of Rights: "* * * Nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him." And Section 2: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." The fourteenth amendment of the Constitution of the United States, in so far as it is applicable to the question in hand, provides: "* * * Nor shall any State deprive any person of life, liberty, or property, without due process of law. * * *" The conclusion of the majority of the court is rested upon Section 213 of the Constitution, which, it is said, justifies the judgment of the chancellor below. This is as follows: "Sec. 213. All railroad, transfer, belt lines and railway bridge companies, organized under the laws of Kentucky, or operating, maintaining or controlling any railroad, transfer, belt lines or bridges, or doing a railroad business in this State, shall receive, transfer, deliver and switch empty or loaded cars, and shall move, transport, receive, load or unload all the freight in car loads or less quantities, coming to or going from any railroad, transfer, belt line, bridge or siding thereon, with equal promptness and dispatch, and

without any discrimination as to charges, preference, draw-back or rebate in favor of any person, corpora-tion, consignee or consignor, in any matter as to payment, transportation, handling or delivery; and shall so receive, deliver, transfer and transport all freight as above set forth, from and to any point where there is a physical connection between the tracks of said companies. But this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of an-other engaged in like business.''

The fundamental error in the opinion, as I see it, is in construing Section 213 to require appellants to deliver its cars to a rival carrier. In reaching this construction, the court recites as an argument in its favor that the debates in the constitutional conven-tion relative to Section 213 show, or tend to show, that that body desired to impose upon railroads the interchange of cars in the interest of public commerce, so that every such carrier would not only be obliged to receive and forward all car loads of freight brought to it by another, but to turn over its own cars to any connecting road for the purpose of transporting freight to points on the connecting road and beyond the line of the owner of the cars. I have carefully read the debates of the convention, and fail to find any trace of such an intention. Section 213 was pre-pared and introduced by the delegate from the Fourth district of the city of Louisville, who announced in the convention that he, alone, was the author, and responsible for its introduction. That there may be no mistake upon this question, I quote his exact lan-guage: ''I assume its entire responsibility. I wrote every line of it; not only that, but I submitted it to the ablest legal minds in the United States.'' Debates Constitutional Convention, vol. 4, p. 5127. As this assertion was unchallenged by any member, we may assume that there was no contrariety of opinion as to the authorship of the proposed section, which is now 213; and, as the author was a learned lawyer

who had been actively litigating the wrongs which the section was to remedy for many years prior to the meeting of the convention, it may be assumed that he understood what he desired to accomplish by the section, and what the language used in it meant. No one can read the thirty or forty pages of the reports of the convention on the subject of this section without being impressed with the fact that the trouble which had existed before, and which it was proposed to remedy, was the discriminatory refusal of certain railroads to receive and transport car loads of freight brought to them by certain other roads, and there is an entire absence of any thought on the part of the convention that railroads should be forced to deliver their own cars to connecting lines, to be carried beyond the lines of the owners. The author and proposer of the section under discussion was allowed to debate his side of the proposition, that the proposed section should be adopted alone, and in explaining its meaning he spoke often, fully, and freely.

I have selected the following excerpts from his explanation as to what the proposed section meant, in order that there may be no doubt as to what he said on this subject: "All this section (213) means is that it shall do exactly the same business for one road that it does for another, upon the same terms, and I hope that amendment will not prevail. You cannot use anybody's property without paying for it, and the object of this is not to take people's property without paying for it, but simply to declare, where they render service to one corporation or individual, they shall render the same service to another corporation or individual at the same price. I do not believe anybody can deny the justice of that provision." Volume 4, pp. 5118, 5119. "We do not want to take it. We do not want to run trains across anything. We simply want to say that, when you offer to carry for one person, you shall carry for another person at the same price." Volume 4, pp. 5132, 5133. "We say they shall receive. The gentleman says you must

not make them receive.'' Volume 4, p. 5136. ''I could do it, but you have discussed your substitute. I am on mine. All that this demands is that, when one road brings up freight to another, that it shall be compelled to take it alike for all.'' Volume 4, p. 5136. ''No, sir; I think every railroad should be compelled to receive freight at the point of intersection. Anything else will amount to a destruction of interchange between them.'' Volume 4, p. 5138. ''Again and again he exclaims: 'Why do you not do that?' Because it has no application here. There is no provision in this section for one company to use the terminal facilities of any other company. It says not a word about any use. Nobody wants to use them; but we do want, when they take cars from one company, when they take freight from one individual, and haul them, that they shall take cars and freight from every other individual on exactly the same terms. There is no taking of terminals. There is no use of tracks. This section contains no such phrases, and is subject to no such interpretation. It only requires a fair, honest, equal, uniform conduct of business to all alike, from whomsoever or wherever they come, be they Jew, Greek, Gentile, bond or free, that all shall receive exactly the same treatment, and be put on the same footing.'' Volume 4, pp. 5156, 5157. It will thus be seen that, while there is some general language as to serving the public alike and without discrimination, it was all directed to the discrimination resulting from the refusal to carry freight for all alike. It is evident that the framers of the Constitution did not intend to place a new burden upon railroads, but to compel them to fully and fairly discharge an old duty imposed upon them by the common law.

At the common law there is no duty imposed upon railroads to carry freight beyond their own lines, or to furnish cars to any connecting road so to do. Central Stockyards Company v. Louisville & Nashville Railroad Company, 118 Fed. 113, 55 C. C. A.

63, and the cases there cited. But it was, and is, their duty, growing out of the nature of their business, to carry all freight brought to them without discriminating in favor or against any person or corporation. It was strictly within the line of their duty to transport the loaded cars brought to them by connecting roads before the adoption of the Constitution. It was, therefore, no hardship to require them to take the freight in the loaded cars of other roads without discrimination. Indeed, it is very much to their interest so to do, as it facilitates commerce, lessens their labors, and increases their remuneration. But it is a very different proposition to require a railroad, against its will, to deliver to a connecting line its rolling stock, to be taken out of its possession and control, and placed in the possession and dominion of the connecting carrier. And it is too obvious to need elaboration that if a State can require a railroad to thus deliver to another its rolling stock, without regard to what it may receive in return from the connecting road, it is not only possible, but at times very probable, that a railroad will be so crippled by the loss of its cars as to be unable to perform its primary duty of transporting freight between its own termini. Without stopping at present to discuss this view of the question, it seems to me that it is a serious reflection upon the wisdom and the justice of the framers of the Constitution to assume that they intended to accomplish by Section 213 so radical and far-reaching an end, and yet made no provision for, or even allusion to, a railroad thus deprived of its rolling stock being remunerated in any way for its loss, or having any guaranty for the return of its property. There was no necessity for any guaranty if the section be limited in its meaning to receiving and carrying freight in car load lots, as a railroad will only receive car loads of freight when the connecting carrier is willing to turn them over to it, and, presumably, when this is done by consent, the parties will take care of their own interest. But the converse of this proposition is not

true; for, if a railroad may be deprived of its cars against its will without a provision for remuneration for their use or a guaranty of their return, then it is clear that it lies with the corporation receiving the property, and not with the owner, to say whether or not it shall be paid for or returned without a law suit.

My construction of Section 213, that it is limited to receiving and transporting cars, is strengthened by the precaution of the framers of the Constitution to protect the receiving railroad by this language: "But this section shall not be construed as requiring any such common carrier to allow the use of its tracks for the trains of another engaged in like business." This accentuates the view that the convention had in mind only the receiving of freight, and not the delivery of cars against the consent of the owner; and shows a disposition to guard against loss wherever there was danger of its being inflicted. It seems to me unbelievable that these wise and conservative men would have placed one carrier so completely in the power of another without any provision looking to the ultimate protection and remuneration of the corporation against the loss, and for the use, of its property. Section 216 of the Constitution is as follows: "All railway, transfer, belt lines and railway bridge companies shall allow the tracks of each other to unite, intersect and cross at any point where such union, intersection and crossing is reasonable or feasible." Here we have a provision which requires every railroad in the State to permit a physical connection with any other railroad at any feasible point along its line; and, if the court's construction of Section 213 is sound, it is very clear that any railroad in the State may become the prey of any other road which chooses to make a connection with it. To illustrate: A railroad is built between Bowling Green and Louisville. The company is organized for the purpose and with the view of serving the public along the line of its road between those points. In order to

discharge the duty imposed upon it by the common law, it procures a sufficient number of cars to carry all freight that is brought to it for transportation. Now, let us suppose that another railroad connects with it, whose stockholders do not choose to purchase a sufficient quantity of rolling stock to carry on its business. It is easy to see that under the rule laid down here it would not be difficult for the second railroad to soon get possession of any number of cars belonging to the first, and put them to use in its business, and practically the first will be helpless, as an action in trover or detinue will not furnish an adequate remedy. Before the process of the court could be enforced, or other cars purchased to supply the loss, incalculable injury might be done by the failure of the first road to have the use of its rolling stock. The law in one breath requires a railroad to keep on hand a sufficient quantity of rolling stock to discharge all of the business brought to it. It ought not in the next to make this impossible by placing it in the power of another railroad to deprive it of its equipment for an indefinite time. And certainly the court ought not to reach the conclusion that the framers of the Constitution meant to do this without providing some remedy against ultimate loss, unless the language used excludes by its rigor a more reasonable construction.

It is no answer to all this to say that it is the custom of railroads to interchange cars, and that they have a fixed agreement for the remuneration of the owner when a connecting carrier uses its rolling stock. That is a matter of contract, and leaves every road free to protect itself in making its contract of interchange. The basic principle running through the custom, where it exists, is that the interchanging roads will receive from each other approximately the same number of cars, and with this in view the remuneration is fixed more as a matter of bookkeeping than of rental, and it must not to be forgotten that this custom is based upon the right of each road to

keep its own cars within its termini whenever its
interest demands this to be done. It leaves each car-
rier free to refuse to deliver its cars to any road
whose business does not supply in exchange an equal
number of cars which it receives. In other words,
each road has the power of protecting itself, and
keeping its own property when it desires so to do. It.
seems to me a poor argument that, because the owner
rents his house for a number of months when he does
not need it, he should, therefore, be required, against
his consent, to give it to another when he needs it
himself. In Lake Shore, etc., Railway v. Smith, 173
U. S. 697, 19 Sup. Ct. 565, 43 L. Ed. 858, in referring
to a statute of Michigan which sought to compel the
issue of a certain class of tickets with certain desig-
nated privileges attached, the Supreme Court of the
United States, in holding the act unconstitutional,
said: "It is no answer to the objection to this legis-
lation to say that the company has voluntarily sold
thousand-mile tickets good for a year from the time
of their sale. What the company may choose volun-
tarily to do furnishes no criterion for the measure-
ment of the power of a Legislature. Persons may
voluntarily contract to do what no Legislature would
have the right to compel them to do. Nor does it
furnish a standard by which to measure the reason-
ableness of the matter exacted by the Legislature.
The action of the company upon its own volition,
purely as a matter of internal administration, and in
regard to the details of its business which it has the
right to change at any moment, furnishes no argu-
ment for the existence of a power in a Legislature to
pass a statute in relation to the same business impos-
ing additional burdens upon the company." It was
this consideration, doubtless, that induced the Su-
preme Court, when the interstate branch of this case
was before it, to construe Section 213 to relate en-
tirely to the receiving of cars, and to conclude that
it did not require the enforced turning over by one
road of its rolling stock to another. Central Stock-

yards Company v. Louisville & Nashville Railroad Company, 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565. This litigation was divided into two branches, one brought in the Federal court and the other in the Jefferson Circuit Court—the first to restrain the Louisville & Nashville Railroad from refusing to deliver its cars loaded with interstate commerce to the Southern Railway to be unloaded at the Central Stockyards, and this in the State court to restrain it from refusing to deliver its cars loaded with interstate commerce to the same road for the same purpose, the only difference being that in the first the cars were loaded with stock from Tennessee, and in the second they were loaded with stock shipped from points in Kentucky. The same questions made here were made in the Federal court.

The Supreme Court, after pointing out that the third section of the interstate commerce act did not authorize the granting of the prayer of the bill, said: "We also lay on one side the question whether the section of the Constitution of Kentucky (213) is or not invalid as an attempt to regulate commerce among the States; for we are of opinion that the defendant's conduct is not within the prohibitions or requirements of either the act of Congress or the Constitution of Kentucky, as those provisions fairly should be construed." Again it is said: "In view of the course taken by the argument, we may add that we do not find a requirement that the railroad company shall deliver its own cars to another road. The earlier part of Section 213 provides that all railroads 'shall receive, transfer, deliver and switch empty or loaded cars, and shall move, transport, receive, load or unload all the freight in car loads or less quantities, coming to or going from any railroad. * * * with equal promptness and dispatch, and without any discrimination. * * *'" Promptness and the absence of discrimination are the point, and that shows that the words 'coming to or going from any railroad,' qualify the words 'empty or loaded cars' as well as

'freight,' and therefore that the cars referred to are cars from other roads. The same thing is shown by the word 'receive,' which is the starting point of all that relates to cars. See Louisville & Nashville R. R. Co. v. Commonwealth, 108 Ky. 628, 633, 57 S. W. 508, 22 R. 328. The other sections of the Constitution need no special remark." It is true that this court is not bound by the construction of the Supreme Court of the United States of our Constitution or statutes. On the contrary, it is true that after this court has construed our Constitution or statutes the Supreme Court for the purposes of any Federal question which may arise thereon, will adopt the construction of this court; but it seems to me that where, as here, our Constitution has come before the Supreme Court of the United States in advance of an adjudication from our own court, and that tribunal has been forced to place a construction upon a section of it, this construction should, at least, be highly persuasive when the same section afterwards comes before us. In my opinion, taking into consideration the debates of the constitutional convention, the wrong to be remedied, and the language used, as well as the hardship arising from a contrary construction, the view of the Supreme Court of the United States as to the meaning of Section 213 is sound. As, however, the court has declined to follow the construction of the Supreme Court, and holds that Section 213 authorizes the taking of appellant's cars from its possession, and turning them over to the possession and control of the Southern Railway Company, it remains to consider whether or not this section, as thus construed, is in conflict with the fourteenth amendment of the Federal Constitution, which forbids the taking of property without due process of law. I presume it will not be questioned that the cars are the private property of the owner within the meaning of the Federal Constitution, and that it is only necessary, therefore, to ascertain whether the judgment under discussion is a "taking" within the meaning of the due-process

clause of the fourteenth amendment. I do not be-
lieve that if the Southern Railway should take the
cars of the Louisville & Nashville Railroad without
the judgment of the court, and do with them just what
it does under the judgment, anybody would doubt
that that was a wrongful taking of the property, for
which the owner could at once institute an action at
law, either to recover the property itself or damages
for its wrongful conversion. The effect of the Con-
stitution, as embodied in the judgment, on the prop-
erty of the Louisville & Nashville Railroad, produces
the precise result, so far as the loss is concerned,
that would take place if the Southern Railway should
take it on its own initiative. The Louisville & Nash-
ville Railroad is deprived of its property to the same
extent in each case. It must, then, be true that the
judgment of the court enforcing the constitutional
provision under discussion is a taking of the prop-
erty of appellant within the meaning of the due-
process clause of the Federal Constitution. Black-
stone, in his Commentaries (volume 2, p. 2), says:
"There is nothing which so generally strikes the
imagination, and engages the affections of mankind,
as the right of property, or that sole and despotic
dominion which one man claims and exercises over
the external things of the world, in total exclusion
of the right of any other individual in the universe."
Any act, then, which deprives the owner of the sole and
despotic dominion of his property, which he claims
and exercises in total exclusion of the right of any
other individual in the universe, must be a "taking,"
since that act violates the fundamental definition of
property as laid down by the learned author above
quoted. McGehee, in his word on Due Process of
Law (page 291), thus states the requirements of a
"taking" within the meaning of the Constitution:
"According to the broad and equitable doctrine of
modern cases, it is not necessary to constitute a 'tak-
ing' of property for public purposes that the actual
occupancy or possession of the property should be

assumed and its title 'acquired. A physical inter-
ference with property which substantially abridges
the owner's right to use and enjoy it and to exclude
others from its use takes his property to just the
extent that he is deprived of its enjoyment. A serious
interruption to the common and necessary use of
property has been said to be equivalent to taking
it within the constitutional provision, and it is not
necessary that the land be absolutely taken.'' In the
case of United States v. Lynah, 188 U. S. 445, 23
Sup. Ct. 379, 47 L. Ed. 539, it was held that the flood-
ing of the owner's lands by a public improvement car-
ried on by the United States government, whereby he
was temporarily deprived of its use, was a taking
of private property within the inhibition of the fifth
amendment of the United States Constitution. The
case of Missouri Pacific Railway v. Nebraska, 164 U.
S. 403, 17 Sup. Ct. 130, 41 L. Ed. 489, involved this
question; under the Constitution and a statute of
Nebraska, the effect of which, as construed by the
State court, fully authorized what was done under
them, the railway company was required to permit
certain private parties to build grain elevators on its
right of way, which it was not using at the time. It
also appeared that others had been permitted to
build elevators on the right of way near the railroad
tracks. On writ of error to the Supreme Court of
the United States, the question arose as to whether
or not this was a taking of private property without
due process of law. In the opinion it was said: ''This
court, confining itself to what is necessary for the
decision of the case before it, is unanimously of opin-
ion that the order in question, so far as it required
the railroad corporation to surrender a part of its
land to the petitioners for the purpose of building and
maintaining their elevator upon it, was, in essence
and effect a taking of private property of the rail-
road corporation, for the private use of the petition-
ers. The taking by a State of the private property
of one person or corporation, without the owner's

consent, for the private use of another, is not due process of law, and is a violation of the fourteenth article of amendment of the Constitution of the United States. Wilkinson v. Leland, 2 Pet. (U. S.) 627, 658, 7 L. Ed. 542; Murray v. Hoboken Co., 18 How. 272, 276, 15 L. Ed. 372; Loan Association v. Topeka, 20 Wall. (U. S.) 655, 22 L. Ed. 455; Davidson v. New Orleans, 96 U. S. 97, 102, 24 L. Ed. 616; Cole v. La Grange, 113 U. S. 1, 28 L. Ed. 896; Falibrook District v. Bradley, 164 U. S. 112, 158, 161, 17 Sup. Ct. 56, 41 L. Ed. 369; State v. Chicago, Milwaukee & St. Paul Railway, 36 Minn. 402, 31 N. W. 365."

To the same effect is State of Minnesota v. Chicago, Milwaukee & St. Paul Railway Co., 36 Minn. 402, 31 N. W. 365. In the case of Chicago, Burlington, etc., Railroad v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, it was said: "It is proper now to inquire whether the due process of law enjoined by the fourteenth amendment requires compensation to be made or adequately secured to the owner of private property taken for public use under the authority of a State." Then, after reviewing a great number of authorities bearing upon the question, the court concluded: "In our opinion, a. judgment of a State court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is upon principle and authority, wanting in the due process of law required by the fourteenth amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument." See, also, Davidson v. New Orleans. 96 U. S. 97, 24 L. Ed. 616; Fletcher v. Peck, 6 Cranch (U. S.) 135, 136; Loan Association v. Topeka, 20 Wall. (U. S.) 655, 22 L. Ed. 455; Gardner v. Newburgh, 2 Johns, Ch. (N. Y.) 162, 7 Am. Dec. 526; Searl v. School District, 133 U. S. 553, 10 Sup. Ct. 374, 33 L. Ed. 740; Scott v. Toledo, 36 Fed. 385-396, 1 L. R. A.

688; Mt. Hope Cemetery v. Boston, 158 Mass. 509, 33 N. E. 695, 35 Am. St. Rep. 515; Cooley's Edition of Story on Constitution, Sec. 1596.

From the foregoing authority the rule is deduced that in order for a State to take private property for public use consistently with the due-process clause of the Federal Constitution, it must establish a mode of ascertaining the damage and providing for payment to the owner. If this is not done, the statute is void. It is also clear that while State governments may regulate corporations under the police power, yet, as said in Lake Shore, etc., Railway Company v. Smith, 173 U. S. 689, 19 Sup. Ct. 565, 43 L. Ed. 858: "This power must, however, be exercised in subordination to the provisions of the Federal Constitution. If, in the assumed exercise of its police power, the Legislature of the State directly and plainly violates a provision of the Constitution of the United States, such legislation would be void." Again: "A railroad company, although a quasi public corporation, and although it operates a public highway (Cherokee Nation v. Southern Kansas Railway, 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295; Lake Shore, etc., Railway v. Ohio, 173 U. S. 285, 301, 19 Sup. Ct. 465, 43 L. Ed. 702), it has nevertheless rights which the Legislature cannot take away without a violation of the Federal Constitution, as stated in Smyth v. Ames, 169 U. S. 466, 544, 18 Sup. Ct. 418, 42 L. Ed. 819. A corporation is a person within the protection of the fourteenth amendment. Minneapolis & St. Louis Railway v. Beckwith, 129 U. S. 26, 9 Sup. Ct. 207, 32 L. Ed. 585; Smyth v. Ames, 169 U. S. 466, 522, 526, 18 Sup. Ct. 418, 42 L. Ed. 819. Although it is under governmental control, that control must be exercised with due regard to constitutional gaurantees for the protection of its property." In the case of Central Stockyards Company v. Louisville Railroad Company, supra, on the question we have in hand the Supreme Court said: "On the other hand, if the cattle are to remain in the defend-

ant's cars, it cannot be required to hand those cars over to another railroad without a contract, and the courts have no authority to dictate a contract to the defendant, or require it to make one.'' (Authorities omitted.)   It seems to me to require no argument to show that the net result of the court's action in this case is to take the property of the appellant and give it to the Southern Railway; that after it is so given the Southern Railway may use it as long as it chooses, perhaps destroy it in a railroad wreck, and leave the owner with only an action at law to recover its property, or its value, taking the chance of the Southern Railway being solvent.   After being unloaded, it is easy to see that these cars instead of being returned, may be put in use by the Southern Railway, carried out of this State, and therefore beyond the jurisdiction of this court, or any court in Kentucky.   If the Southern Railway desires the cars of the Louisville and Nashville Railroad, it now has an endless chain, through the operation of the opinion of this court, with which it can draw from it all of the rolling stock that it needs, leaving the denuded corporation, perhaps, unable to perform its duty to the public, or to earn dividends for the stockholders.   In other words, it is not going beyond the language of conservatism to say that it is entirely within the power of the Southern Railway, considering the general shortage of cars existing all over the country, to bankrupt the Louisville & Nashville Railroad by taking its cars under the order of this court, leaving it with only a claim for their rental at a sum which may be entirely nominal.   The rate fixed for the rental of a railroad's surplus cars affords no just criterion by which to gauge the loss of those necessary to perform the business for which it was chartered.

On the subject of the interstate commerce feature of this case, I have only this to say:  This litigation was begun by bringing the present suit in the State court.   After the granting of the preliminary injunction, a question arose in the circuit court as to

whether the terms of the injunction covered inter-
state shipments, as well as intrastate shipments, or
covered only the latter class of shipments. The cir-
cuit court interpreted its own order as covering both
classes of shipments, and accordingly imposed a fine
on the railroad company for disobeying the order of
injunction in refusing to switch certain cars which
had come from another State. The railroad com-
pany applied to this court for an order of prohibition
against the judge of the circuit court to prevent him
from enforcing the order of punishing for contempt
of court on the ground that the preliminary injunc-
tion did not cover interstate shipments; and this
court held that the order did not cover such ship-
ments, and therefore granted the prohibition asked
for. Louisville & Nashville Railroad Company v.
Miller, 66 S. W. 5, 23 Ky. Law Rep. 1714. Immediate-
ly following this proceeding the stockyards company,
instead of moving the circuit court to extend its
order of injunction, filed a bill in the United States
Circuit Court, in which it is alleged exactly the same
facts and sought exactly the same relief, so far as the
interstate shipments of stock were concerned, as it
sought in the State court. The United States Circuit
Court dismissed the bill, whereupon the case was ap-
pealed to the United States Circuit Court of Appeals,
where the judgment was affirmed, and from which
judgment a further appeal was taken to the Supreme
Court of the United States, where again the judg-
ment was affirmed; the affirmance by the Circuit
Court of Appeals being upon the ground that Sec-
tion 213 of the Kentucky Constitution, if given the
construction contended for by the stockyards com-
pany, is a regulation of interstate commerce, and
therefore void, while the affirmance by the Supreme
Court was upon the ground that the section in ques-
tion was not properly susceptible of the interpreta-
tion contended for by the stockyards company, and
that the acts of the railroad company were not in
violation of that section, when properly construed.

The bill filed in the Federal Court expressly sought
to accomplish the purpose of the stockyards company
by claiming the right to stop the interstate shipments
in transit, and to change the destination thereof, so
as to require the delivery of the stock after reaching
the State of Kentucky, in accordance with section
213 of the Kentucky Constitution; it being alleged in
the Federal Court bill that the railroad company re-
fused to permit the consignor or the consignee, or
both, to change the destination of shipments, and to
have same switched and transferred to the Southern
Railway Company for delivery at the Central Stock
Yards, and a part of the prayer of the bill being
that the railroad company be required to recognize
the right of parties to change destination of ship-
ments and to make delivery as demanded pursuant
to such change. But this relief, as well as all other
relief sought by the bill in the Federal Court, was, of
course, denied in the dismissal of the bill. After this
decision by the Federal Courts the railroad company
offered in the State Court an amended and supple-
mental answer, pleading the litigation in the Fed-
eral Court, and the judgment therein as res adju-
dicata, making a copy of the bill in the Federal
Court and a copy of the opinion of the Circuit Court·
of Appeals exhibits with the amended answer (the
pleading being offered before the final affirmance by
the Supreme Court), so as to show exactly what was
involved in that litigation. The Circuit Court re-
fused to allow this pleading to be filed, on the ground
that it did not present any defense; but by an order
of court made the pleading and its exhibits a part
of the record for the purposes of appeal and there-
after entered the judgment now appealed from, re-
quiring the railroad company to recognize the right
of the shipper to change destination of shipments,
and to make delivery in accordance with such change.
Thus the State Court has wholly disregarded and
treated as a nullity a judgment of the Federal Court
between the identical parties and upon exactly the

same alleged cause of action. If the judgment of the
Federal Courts refusing the relief sought is not final
and conclusive between the parties, as res adjudicata,
then I do not see how the judgment of the State Court
granting the relief will be any more conclusive; for
I take it that a judgment refusing certain relief on a
certain state of facts is just as conclusive as a judg-
ment granting the relief between the same parties
upon the same state of facts. And, if neither of these
judgments is final or settles the controversy between
these parties, then it may go on forever. In the opin-
ion written for the court by Mr. Justice Day, in the
Circuit Court of Appeals (118 Fed. 113, 55 C. C. A.
63, 63 L. R. A. 213), it was decided that the very acts
and shipments which the opinion here undertakes
to regulate was interstate commerce, and beyond the
power of state regulation; and while the Supreme
Court affirmed the judgment  on a different ground
from that upon which the opinion of the Circuit
Court of Appeals was in part, at least, rested, the
Supreme Court has, in a later case (McNeil v. South-
ern Railway Company, 202 U. S. 562, 26 Sup. Ct. 726,
50 L. Ed. 1142), expressly approved what was said in
the opinion, in the following language: "The direct
burden and resulting regulation of interstate com-
merce operated by an alleged assertion of State au-
thority similar in character to the one here involved
was passed upon by the Circuit Court of Appeals
for the Sixth Circuit in Central Stockyards Company
v. Louisville & Nashville R. R. Co., 118 Fed. 113, 55
C. C. A. 63. The court in that case was called upon
to determine whether certain laws of Kentucky im-
posed a direct burden upon interstate commerce and
were a regulation of such commerce, upon the as-
sumption that those laws compelled a common car-
rier engaged in interstate commerce transportation
to deliver cars of live stock moving in the channels
of interstate commerce at a particular place beyond
its own line different from the general place of deliv-
ery established by the railway company. In pointing

out that, if the legislation in question was entitled
to the construction claimed for it, it would amount
to a state regulation of interstate commerce, it was
aptly and tersely said (page 120 of 118 Fed., page 69
of 55 C. C. A.): 'It is thoroughly well settled that a
State may not regulate interstate commerce, using
the terms in the sense of intercourse and the
interchange of traffic between the States. In the
case at bar we think the relief sought pertains to the
transportation and delivery of interstate freight. It
is not the means of making a physical connection
with other railroads that is aimed at, but it is sought
to compel the cars and freight received from one state
to be delivered to another at a particular place and
in a particular way. If the Kentucky Constitution
could be given any such construction, it would follow
it could regulate interstate commerce. This it cannot
do.' ''

I do not propose to question the right of the owner
of property to stop it in transit where this imposes
no additional expense or trouble on the carrier; but
I do question his right to change the contract be-
tween him and the carrier while the goods are in
transit so as to evade the Constitution and laws of
the United States. The particular contract before us
is that the Louisville & Nashville Railroad would
haul stock loaded on its cars in Tennessee and deliver
it at its depot, the Bourbon Stockyards, in Louis-
ville, Ky. This was interstate commerce, expressly
so decided by the Federal Courts with this very rec-
ord before them. After the cars cross the imaginary
line between Tennessee and Kentucky, the shipper
proposes to have the carrier deliver his stock at a
place and in a manner which it is conceded he had
no right to require when the stock was loaded in Ten-
nessee. And we are gravely informed that after the
cars containing the stock cross the imaginary line
between Tennessee and Kentucky the shipment ceases
to be interstate and becomes intrastate commerce. In

other words, that the laws of Kentucky meet the train at the line between Kentucky and Tennesse, and from that point on take charge of and control it. If this can be done in Kentucky, it can also be done in Tennessee, and Tennessee laws can take charge of the stock loaded in that state, conduct, manage, and control them until they get to the line between that state and Kentucky, and after the train crosses, as said before, the laws of Kentucky will take charge of, manage and control it. This, it must be conceded, reduces the sphere of action of the Constitution and laws of the national government, concerning interstate commerce, to a very narrow space.

In conclusion, no court of last resort has enunciated oftener, or more forcibly, or adhered more consistently to, the doctrine of res adjudicata than our own. Beginning with the leading case of Davis v. McCorkle, 14 Bush, 746, this court has consistently held that, when a matter is once put in issue and is passed upon by a court of competent jurisdiction, it cannot be again litigated between the same parties as long as the former decision continues in force. For the first time in its history, so far as I am advised, this court has departed from that rule.

For these reasons I dissent from the opinion of the majority of the court.